## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Criminal No. 1:19-CR-00281** |
| | **:** | |
| **v.** | **:** | **(Judge Wilson)** |
| | **:** | |
| **CESAR RODRIGUEZ-AREVALO** | **:** | **(Electronically Filed)** |

## BRIEF IN SUPPORT OF MOTION TO DISMISS INDICTMENT

Respectfully submitted,

Date:  March 11, 2022

*/s/ Ari D. Weitzman*
ARI D. WEITZMAN, ESQUIRE
Asst. Federal Public Defender
Attorney ID# PA81927
100 Chestnut Street, 3rd Fl.
Harrisburg, PA  17101
Tel. No. 717-782-2237
Fax No. 717-782-3881
*ari_weitzman@fd.org*
*Attorney for Cesar Rodriguez-Arevalo*

## Table of Contents

Table of Authorities ........................................................................ iii

Introduction ..................................................................................... 1

Procedural History .......................................................................... 4

Legal Background ........................................................................... 4

Argument ......................................................................................... 8

    A. Section 1326 Disparately Impacts Latinxs .................................... 8

    B. The 1929 Congress Acted with Discriminatory Purpose when it
    Criminalized Reentry under the Undesirable Aliens Act ............................. 9

        1. The first factor (the law's historical background) shows a
        discriminatory purpose because the 1929 Congress relied on racist
        theories of eugenics. ......................................................... 10

        2. The second factor (events leading up to the law) shows a
        discriminatory purpose because reentry's criminalization was a
        compromise between nativists and industry ................................... 13

        3. The third factor (legislative history) shows a discriminatory purpose
        because legislators used racist language ..................................... 16

        4. The fourth factor (deviations from procedural norms) shows a
        discriminatory purpose because Congress relied on eugenics and race
        vitriol ....................................................................... 24

    C. The 1952 Recodification Did Not Cleanse the Unlawful Reentry Statute of
    its Racist Origins ................................................................... 26

    D. The 1952 Congress Acted with a Discriminatory Purpose When it
    Recodified the Provision of the Undesirable Aliens Act Criminalizing
    Reentry ............................................................................ 31

1.  The first factor (the law's historical background) shows a discriminatory purpose because the racism of 1929 had not dissipated in 1952 ................................................................................... 31

2.  The second factor (events leading up to the law) shows a discriminatory purpose because the 1952 Congress passed related legislation using racial slurs ............................................................. 36

3.  The third factor (legislative history) shows a discriminatory purpose because the 1952 Congress overturned a presidential veto calling out the INA's racism. ................................................................. 37

4.  The fourth factor (deviations from procedural norms) shows a discriminatory purpose because the 1952 Congress knew about §1326's racist origins – and said nothing.......................................... 38

5.  New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's Constitutionality ............................................... 41

E.  Mr. Rodriguez-Arevalo has Demonstrated Disparate Impact and Discriminatory Purpose, so the Burden Shifts to the Government ............. 44

Conclusion ...................................................................................................... 45

Certification of Word Count ............................................................................ 48

Certificate of Service ...................................................................................... 49

# Table of Authorities

## Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)........................................................................... 28, 29, 30

*Arce v. Douglas*,
   793 F.3d 968 (2015) .................................................................................. 8, 24, 40

*Ave. 6E Investments, LLC v. City of Yuma*,
   818 F.3d 493 (9th Cir. 2016) .......................................................................... 13, 24

*Buck v. Bell*,
   274 U.S. 200 (1927) ..........................................................................................12

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020)................................................................................... 42, 43

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ................................................................... 6, 7, 23, 28, 43

*Keene Corp. v. United States*,
   508 U.S. 200 (1993) ..........................................................................................28

*La Union del Pueblo Entero v. Ross*,
    353 F. Supp.3d 381 (D. Md. 2018) ..................................................................35

*Loving v. Virginia*,
   388 U.S. 1 (1967) .........................................................................................4, 32

*Miller v. Johnson*,
   515 U.S. 900 (1995) ..........................................................................................29

*Ms. L. v. U.S. Immigration and Customs Enforcement*,
   302 F.Supp.3d 1149 (S.D. Cal. 2018)............................................................ 45

*Pac. Shores Properties, LLC. v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ..........................................................................24

*Perry v. Perez*,
    565 U.S. 388 (2012) ..............................................................................29

*Pueblo Entero v. Ross*,
    353 F. Supp.3d 381 (D. Md. 2018)......................................................36

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020).......................................................... 28, 42, 43

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017)............................................................................4

*United States v. Carrillo-Lopez*,
    ---F.Supp.3d---, 2021, 2021 WL 3667330, 2021 U.S. Dist. LEXIS 155741 (D.
    Nev. Aug. 18, 2021) ..................................................................... *passim*

*United States v. Fordice*,
    505 U.S. 717 (1992) ............................................................... 28, 43

*United States v. Machic-Xiap*,
    2021 Wl 3362738 (D. Or. Aug.3, 2021) ............................. 8, 9, 10, 26

*United States v. Ryder*,
    110 U.S. 729 (1884) ..............................................................................28

*United States v. Windsor*,
    570 U.S. 744 (2013) ................................................................................4

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ..................................................................... *passim*

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................................5

*Westminster Sch. Dist. Of Orange Cty. v. Mendez*,
    161 F.2d 774 (9th Cir. 1947)................................................................32

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ................................................................................5

**Statutes**

18 U.S.C. § 1326 ............................................................................. *passim*

**Other Authorities**

*Assembly-Line Justice: A Review of Operation Streamline*, University of
California, Berkley Law School, The Chief Justice Earl Warren Institute on
Race, Ethnicity & Diversity, Jan. 2010 ................................................46

B. Simon, *The Appeal of Cole Blease of South Carolina: Race, Class, and Sex in
the New South*, The Journal of Southern History (Feb. 1996),
http://www.jstor.com/stable/2211206 ................................................16

Benjamin Gonzalez O'Brien, *Handcuffs and Chain Link* (2018) ..........................15

*Congressional Record* (Feb. 3, 1928)…………………………………………..19

*Congressional Record*, (Feb 9, 1928)…………………………………………..17

*Congressional Record* (Jan. 23, 1929)……………………………………………22

*Congressional Record,* (Feb. 16, 1929)…………………………………………..15

*Congressional Record*, Dec. 10, 2019, available at
https://www.congress.gov/116/crec/2019/12/10/CREC-2019-12-10-pt1-
PgE1571-4.pdf (last visited Feb. 7, 2022)…………………………………….47

Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two
Generations of Jews, Italians, and Other European Immigrants Out of America
(2019)*.................................................................................. 11, 12, 18

Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of
Ellis Island* (2002) ...............................................................................18

Dept. of Justice, "Attorney General Sessions Delivers Remarks Discussing the
Immigration Enforcement Actions of the Trump Administration," May 7, 2018,
available at https://www.justice.gov/opa/speech/attorney-general-sessions-
delivers-remarks-discussing-immigration-enforcement-actions (last visited Feb.
7, 2022)…………………………………………………………………………..45

Emergency Immigration Act of 1921,
Pub. L. 67-5 Stat. 5 (1921) ...................................................................11

E.P. Hutchinson, *Legislative History of American Immigration Law*, 1798-1965
(1981)..............................................................................................13

Hans P. Vought, *The Bully Pulpit* (2004) ......................................... 15, 16

Harry Laughlin and Eugenics, Truman State University,
https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/ (last
visited Dec. 20, 2021) ........................................................................13

Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White
Supremacy,* ProPublica (June 19, 2020),
https://www.propublica.org/article/behind-the-criminal-immigration-law-
eugenics-and-white-supremacy (last visited Jan. 26, 2022)................................17

Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over
American Immigration*, 2020 (2020)....................................................12

Kelly Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol* (2010) ........11

Mae M. Ngai, *Impossible Subjects* (2004 William Chafe, et al.).............. 11, 13, 14

Mark Motivans, *Immigration Offenders in the Federal Justice System*,
2010, U.S. Dep't of Justice: Bureau of Just. Stat. 2022 (2013),
https://bjs.ojp.gov/content/pub/pdf/iofjs10.pdf (last visited Jan. 27, 2022)...........8

*Passengers on doomed 1948 flight, their names now emerge from shadows*, Los
Angeles Times (July 190, 2013), https://www.latimes.com/local/la-me-
deportees-guthrie-20130710-dto-htmlstory.html (last visited Jan. 31, 2022)......33

Pub. L. No. 82-283, 66 Stat. 26 (1952)………………………………………35, 39

Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004)……….18

*The Real Illegal Immigration Crisis Isn't on the Southern Border*, The Atlantic,
Apr. 19, 2019……………………………………………………………………..46

U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years 1931-36………………40

*U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses*,
   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-
   facts/Illegal_Reentry_FY20.pdf  (last visited Jan. 27, 2022)...........................2, 9

*United States Sentencing Commission, Quick Facts, Illegal Reentry Offenses*,
   Fiscal Year 2019, https://www.ussc.gov/sites/default/files/pdf/research-and-
   publications/quick-facts/Illegal_Reentry_FY19.pdf
   (last visited Jan. 26, 2022).................................................................................2, 9

*Zoot Suit Riots: After 75 years, .A. looks back on a violent summer*, Los Angeles
   Times (June 4, 2018), https://www.latimes.com/local/lanow/la-me-ln-zoot-suit-
   riots-anniversary-20180604-story.html (last visited Jan. 31, 2022) ...................34

## I.    INTRODUCTION

Racism motivated the passage of the 1929 law that first criminalized reentry, racism motivated the 1952 recodification of that law at 8 U.S.C. § 1326, and the government continues to rely on this racially-motivated law to prosecute Latinxs.

In 1929, Congress passed the Undesirable Aliens Act, which criminalized after-the-fact border crossings as a compromise between two sides – one side consisted of racists obsessed with keeping "rat men" and "mongrels" from poisoning the Anglo-American gene pool; the other side consisted of white business owners seeking cheap labor. So began this country's shameful history of encouraging Latinxs to come and work its fields, only to then prosecute and imprison them for crossing the border.

In 1952, Congress consolidated the country's immigration laws under the Immigration and Naturalization Act (INA). The Deputy Attorney General wrote to Congress asking that it expand the Undesirable Alien Act's provision criminalizing reentry (i.e., returning to the United States following deportation) so that more "wetbacks" could be prosecuted and imprisoned.  Congress complied. President Truman vetoed the INA, urging Congress to "shake off this dead weight of past mistakes" and revise our immigration laws to give "a true reflection of the ideals we stand for." Congress overrode the presidential veto, recodifying the

Undesirable Aliens Act's unlawful reentry provision at 8 U.S.C. § 1326. Congress has since amended §1326 five times, always to increase its penalties.[1]

Today, roughly a third of all federal prosecutions involve §1326 violations, and over 99% of those convicted are Hispanic.[2] Because racism motivated Congress to criminalize reentry and because §1326 disparately impacts Latinxs, the law violates the Fifth Amendment's guarantee of equal protection. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977).

In late 2021, in the District of Nevada, the Honorable Miranda M. Du held an evidentiary hearing on §1326's constitutionality. After reviewing extensive evidence and hearing expert testimony from both Professor Kelly Lytle Hernández[3] and Professor Benjamin Gonzalez O'Brien,[4] Chief Judge Du issued a thorough and well-reasoned order detailing the unlawful reentry statute's sordid

---

[1] *See U.S. v. Carrillo-Lopez,* --- F.Supp.3d ---, 2021 WL 3667330 at *4, 2021 U.S. Dist. LEXIS 155741 (D. Nev. Aug. 18, 2021).

[2] U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf  (last visited Jan. 27, 2022).

[3] Professor Lytle Hernández is the Tom Lifka Endowed Chair in History at the University of California at Los Angeles and a 2019 John D. and Catherin T. MacArthur Fellow. Her curriculum vitae is attached to her Declaration, which is Exhibit A to this Motion.

[4] Professor Gonzalez O'Brien is an Associate Professor of Political Science at San Diego State University. His curriculum vitae is attached to his Declaration, which is Exhibit B to this Motion.

history.[5] In that order, Chief Judge Du not only held that §1326 disparately impacts Latinxs, but also that Congress was motivated by racial animus when it enacted the original unlawful reentry statute in 1929, as well as when it recodified the statute in 1952.  Because the government could offer no evidence that Congress would have enacted the unlawful reentry statute but for its discriminatory purpose, Chief Judge Du ruled that "Section 1326 violates the Equal Protection Clause of the Fifth Amendment" and dismissed the indictment. *See U.S. v. Carrillo-Lopez,* --- F.Supp.3d ---, 2021 WL 3667330, 2021 U.S. Dist. LEXIS 155741 (D. Nev. Aug. 18, 2021).

The defendant, Cesar Rodriguez-Arevalo, stands before this Court accused of violating the very law that Chief Judge Du held to be unconstitutional. Mr. Rodriguez-Arevalo asks this Honorable Court to find that 18 U.S.C. § 1326 violates the equal protection guarantee of the Fifth Amendment to the United States Constitution under the standard articulated in *Arlington Heights,* and dismiss the indictment charging him with illegal reentry in violation of 18 U.S.C. § 1326.

## II.    PROCEDURAL HISTORY

---

[5] Mr. Rodriguez-Arevalo has included as exhibits all evidence that was before Chief Judge Du, including transcripts from the hearings at which Professor Lytle Hernández and Professor Gonzalez O'Brien testified. With this evidence before the Court, the defense does not request an evidentiary hearing. However, should the Court elect to hold an evidentiary hearing, the defense anticipates calling both professors to testify.

By indictment filed on July 21, 2021, Mr. Rodriguez-Arevalo was charged with a single count of illegal reentry in violation of 8 U.S.C. § 1326. On August 23, 2021, Mr. Rodriguez-Arevalo appeared before Magistrate Judge Susan E. Schwab for an initial appearance and arraignment. Mr. Rodriguez-Arevalo entered a plea of not guilty to the indictment and Magistrate Judge Schwab issued an order of detention pending trial. Pretrial motions are due on or before March 11, 2022, with jury selection scheduled to commence on April 4, 2022. A motion to dismiss indictment was filed contemporaneously herewith.

## III.   LEGAL BACKGROUND

The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty or property, without due process of law." U.S. CONST. AMEND. V.[6]  "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967).[7] Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g., Yick*

---

[6] This clause of the Fifth Amendment has been construed to carry an implicit guarantee of equal protection applicable to federal laws, identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

[7] The statute at issue in *Loving* banned interracial marriage.

*Wo v. Hopkins,* 118 U.S. 356 (1886).[8] Third, a legislature may enact a facially

neutral law with a discriminatory purpose, which disparately impacts a disfavored

group. *See, e.g., Arlington Heights*, 429 U.S. at 265.[9] Disparate impact is

established where the law's impact "'bears more heavily on one race than

another.'" *Id.* at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Here, Mr. Rodriguez-Arevalo challenges §1326 only under the third rationale, so

the legal framework of *Arlington Heights* applies.

*Arlington Heights* clarified that the effect of a racially discriminatory law

does not alone make it unconstitutional – challengers must also show "[p]roof of

racially discriminatory intent or purpose" at the time of the law's passage. *Id.* at

265. Determining whether a purpose was discriminatory requires "a sensitive

inquiry into such circumstantial and direct evidence of intent as may be available."

*Id.* at 266. The Supreme Court has identified the following potential sources of

such evidence:

> 1)    the "historical background of the decision;"

---

[8] In *Yick Wo*, the law at issue was a San Francisco ordinance that made it illegal to operate a laundry in a wooden building without a permit by the Board of Supervisors. The Board had discretion to grant or withhold the permits. At the time, about 95% of the city's 320 laundries were operated in wooden buildings. Approximately two-thirds of those laundries were owned by Chinese people. Although most of the city's wooden building laundry owners applied for a permit, only one permit was granted of the two hundred applications from any Chinese owner, while one out of approximately eighty non-Chinese were denied a permit.

[9] In *Arlington Heights¸* a zoning ordinance in the Chicago suburb of Arlington Heights barred the construction of multi-family housing facilities, such as apartment complexes, in the center of the neighborhood, which kept minorities and other economically challenged individuals from moving into the neighborhood.

2)      the "specific sequence of events leading to the challenged decision;"

3)      the "legislative or administrative history;" and

4)      any "[d]epartures from normal procedural sequence."

*Id.* at 267-68. These are referred to as the *Arlington Heights* factors. While not "purporting to be exhaustive," these factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Id.* at 268.

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Id.* at 265. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added); *see also Arce v. Douglas,* 793 F.3d 968, 977 (9th Cir. 2015) (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'"). The standard for this showing is a preponderance of the evidence. *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985).

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights,* 429 U.S. at 270 n.21; *see also Hunter* 471 U.S. at 228 (if racial

6

discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot carry this burden, the challenged law violates the Fifth Amendment and must be invalidated. *Arlington Heights,* 429 U.S. at 270.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter,* 471 U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 228-29. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229, 231. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id*. at 231. Similarly, the Ninth Circuit applied *Arlington Heights* in a challenge to an Arizona law shutting down a Mexican American Studies program in the Tucson school district. *See Arce,* 793 F.3d at 977. During the law's passage, legislators had accused the program of inciting "racial warfare" and supporting a group

7

purportedly claiming that "North America is a land for the bronze peoples." *Id*. at

978. Finding that such comments created a genuine issue of material fact as to

whether the law was "motivated, at least in part, by an intent to discriminate

against [Mexican-American Studies] students on the basis of their race or national

origin," the Court reversed the district court's grant of summary judgment and

remanded for a full trial. *Id*. at 981. As Mr. Rodriguez-Arevalo will show, the same

animus infected §1326 to an equal (or even greater) degree.

## IV.    ARGUMENT

### A.    Section 1326 Disparately Impacts Latinxs

Section 1326 meets the disparate impact prong of the *Arlington Heights* test

because it disparately impacts one race (Latinxs) more than another. For example,

ninety-eight percent of those charged with illegal reentry in 2010 were from Latin

America,[10] and over 99% of those convicted of illegal reentry in 2020 were

Hispanic.[11] And the number of prosecutions has continued to rise – between 2016

---

[10] Mark Motivans, *Immigration Offenders in the Federal Justice System*, *2010*, U.S. Dep't of Justice: Bureau of Just. Stat. 2022 (2013), available at https://bjs.ojp.gov/content/pub/pdf/iofjs10.pdf (last visited Jan. 27, 2022). This disparity is not unique to 2010. *See United States v. Machic-Xiap*, --- F.Supp.2d ---, 2021 WL 3362738 at *10, 2021 U.S. Dist. LEXIS 145037 (D. Or. Aug. 3, 2021) (quoting Professor Lytle Hernández's testimony that "Latin-Mexican nationals" comprised between 85 and 99 percent of defendants in unlawful reentry prosecutions under the Undesirable Aliens Act and "the disparate impact upon Mexican and Latinos has not shifted" in the intervening decades, including after Congress enacted §1326).

[11] U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf (last visited Jan. 27, 2022).

and 2019 the annual number of §1326 cases had risen from 15,813 to 22,077, an increase of nearly 25%,[12] making illegal reentry one of the most common federal felonies today.[13]

In prior equal protection challenges to §1326, the government has not disputed the statute bears more heavily on Latinxs – and courts have found that the statute disparately impacts Latinxs. *See Carrillo-Lopez,* 2021 WL 3667330 at *6-7; *see also Machic-*Xiap, 2021 WL 3362738 at *10.

### B.   The 1929 Congress Acted with Discriminatory Purpose when it Criminalized Reentry under the Undesirable Aliens Act

Racial animus was – at a minimum – a motivating factor in passing the Undesirable Aliens Act and its criminalization of reentry. *See Carrillo-Lopez*, 2021 WL 3667330  at *9 ("the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and . . . these racist theories ultimately fueled the Act's passage"); *Machic-Xiap,* 2021 WL 3362738 at *1 ("racism has permeated the official congressional debate over

---

[12] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses,* Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf (last visited Jan. 26, 2022).

[13] In 2020, the number of illegal reentry prosecutions dipped to 19,654.  Mr. Rodriguez-Arevalo submits that this reduction in cases is likely related to the COVID-19 pandemic and its effect on the judicial system. *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses,* Fiscal Year 2020, *available at:* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf (last visited Jan. 26, 2022).

United States immigration laws since the late 19th and early 20th centuries, including the 1929 Act").

The evidence of racial animus is so overwhelming that, in previous cases, the government has previously "conceded that discriminatory intent motivated the passage of the Act of 1929." *Carrillo-Lopez,* 2021 WL 3667330 at *7. Although it's undisputed that discriminatory intent motivated the Undesirable Aliens Act, it is nevertheless instructive to assess the *Arlington Heights* factors because the Act's background informs the recodification of the unlawful reentry portion of that law in 1952 as 8 U.S.C. §1326.

Mr. Rodriguez-Arevalo submits the following points for consideration under the *Arlington Heights* framework.

> **1.    The first factor (the law's historical background) shows a discriminatory purpose because the 1929 Congress relied on racist theories of eugenics.**

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 266. They were the *primary factor.*

Historians often refer to the 1920s as the "Tribal Twenties" – a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Declaration of Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, at 2.

World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,' and 'few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction.'"[14] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[15] and "the 'contamination' of Anglo-American society.'"[16]

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[17] Many politicians, especially those popularly known as "Nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe." Ex. A, Hernández Dec., at 2. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[18] During the remainder of the decade, legislators aimed for "America [to] cease being the "melting pot."[19] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American

---

[14] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[15] *Id.* at 23.

[16] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

[17] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).

[18] Emergency Immigration Act of 1921, Pub.L. 67-5, 42 Stat. 5 (1921).

[19] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).

manufacturing," Nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[20]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics – a theory that "captured the imagination of many of America's leading intellectuals."[21] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[22] The leader of a major scientific institution contended that neither education nor environment could alter the "profound and inborn racial differences that rendered certain people inferior."[23] And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[24]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[25] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of

---

[20] Hernández, *supra*, at 28.

[21] Yang, *supra*, at 35.

[22] *Id.* at 8.

[23] Okrent, *supra*, at 3.

[24] *Id.* at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[25] Ngai, *supra*, at 24.

Nazi Germany, used as a template.[26] During the 1920s, Dr. Laughlin testified

before Congress multiple times and produced four reports that discussed topics

such as "race crossing," "mate selection," "fecundity," "racial composition," and

the "individual quality of future population." Exhibit C, *The Eugenical Aspects of*

*Deportation: Hearings before the Committee on Immigration and Naturalization*

*House of Representatives,* 70th Cong. 70.1.4, pp. 2, 3 (1928). Relying heavily on

these theories, Congress would anchor its immigration legislation in eugenics and

racial inferiority for the remainder of the decade.[27]

> **2.   The second factor (events leading up to the law) shows a discriminatory purpose because reentry's criminalization was a compromise between nativists and industry.**

In the early 1920s, Congress began to focus its legislation around the

exclusion of "undesirable" immigrants – which was often code for non-white. *See*

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505-506 (9th Cir.

2016) (holding that "the use of 'code words' may demonstrate discriminatory

intent"); *see also Aman v. Cort Furniture Rental*, 85 F.3d 1074, 1083 (3d Cir.

1996)("code words" can be evidence of intent to discriminate). The first such law

---

[26] *Harry Laughlin and Eugenics*, Truman State University.  Accessible at
https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/ (last visited Dec. 20,
2021).

[27] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13
(1981).

was the National Origins Act of 1924, which established quotas based on the

national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the

nation's "racial strains" predominantly Anglo-Saxon.[28] The law on its face did not

count "nonwhite people residing in the United States" toward the quotas it

established. Indeed, its newly created "Quota Board" interpreted this provision to

exclude all Black people; all East and South Asians (including those who had

American citizenship by birth); and all citizens in Hawai'i, Puerto Rico and

Alaska.[29] Congress and the president accepted these exclusions under pressure to

"stand firm against the efforts of 'hyphenates' who would 'play politics with the

nation's blood stream.'"[30]

Yet there was a wrinkle in the National Origins Act – it did not set quotas on

immigrants from countries in the Western Hemisphere.  This was due to the

influence of large agricultural businesses that relied heavily on labor from just over

the border with Mexico.[31] These agri-businesses pressured legislators from western

states to vote against the law, forcing nativists in Congress to "choose between

---

[28] Ngai, *supra*, at 24–25.

[29] *Id*. at 26.

[30] *Id*. at 35.

[31] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).
Miller

accepting a Mexican quota exemption or passing no immigration law at all." Ex.

A, Hernández Dec., at 3. As one representative complained, there was no chance of

capping the number of Mexican immigrants because too many growers were

"interested in the importation of these poor peons." Exhibit D, Representative Box

(TX), "Deportation of Aliens." *Congressional Record,* (Feb. 16, 1929) p. H3619.

As a result, despite passing the most sweeping immigration law in years,

legislators were not happy. Representative Madden grumbled that the bill "leaves

open the doors for perhaps the worst element that comes into the United States –

the Mexican peon."[32] Representative Patrick O'Sullivan criticized the restrictions

on Italian immigrants, stating that "the average Italian is as much superior to the

average Mexican as a full-blooded Airedale is to a mongrel." Exhibit E,

Representative O'Sullivan, "Administration of the Law," *Congressional Record*

65:6 (1924) p. H5900. Legislators "proposed bill after bill" restricting Mexican

immigration but none could survive opposition from southwestern growers. Ex. A,

Hernández Dec., at 5. To solve this problem, a group of key figures began to

strategize a new type of immigration bill that would approach immigration from a

criminal – rather than a civil – angle.

> **3.    The third factor (legislative history) shows a discriminatory purpose because legislators used racist language.**

---

[32] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link: Criminalizing the Undocumented in America* (2018).

After the passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[33] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories – even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[34] Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool."[35]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[36] So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[37] Davis developed a compromise – Congress would

---

[33] *See* Vought, *supra*, at 174–79.

[34] *Id.*

[35] *Id*. at 174–75.

[36] *Id*. at 216.

[37] For biographical and historical context about Senator Blease, s*ee* B. Simon, *The Appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), *available at* http://www.jstor.com/stable/2211206 (last visited Feb. 7, 2022).

criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[38]
That way, he reasoned, authorities could expel Mexicans through a criminal
prosecution after the growing season was over, thereby avoiding resistance from
businesses that depended on Mexican labor.[39] The southwest growers were in
agreement – as one put it, "We, in California, would greatly prefer some set up in
which our peak labor demands might be met and upon the completion of our
harvest these laborers returned to their country." Ex. A., Hernández Dec., at 7.

Secretary Davis and Senator Blease found two eager collaborators in the
House of Representatives, both of whom were on the powerful Immigration and
Naturalization Committee. Representative John C. Box from Texas had long
characterized the goal of immigration law as "the protection of American racial
stock from further degradation or change through mongrelization." Exhibit F,
Representative Box (TX), "Restriction of Mexican Immigration," *Congressional
Record*, (Feb 9, 1928) pp. H2817-18. In one speech at an immigration conference,
Representative Box had explained that

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish
> peasant with low-grade Indians who did not fight to extinction but
> submitted and multiplied as serfs. Into that was fused much negro
> slave blood . . . The prevention of such mongrelization and the
> degradation it causes is one of the purposes of our [immigration] laws.

---

[38] Ian MacDougall,, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*,
ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-
eugenics-and-white-supremacy (last visited Jan. 26, 2022).

[39] *Id.*

*Id.* Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Ex. D at H3619.

Representative Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington. Chairman Johnson – for whom the 1924 "Johnson-Reed" National Origins Act was named – was an "energetic and vehement racist and nativist."[40] He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[41] He also proudly described his 1924 law as a "bulwark against a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed."[42] Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "the fundamental reason for it is biological."[43]

---

[40] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43 (2002).

[41] *Id.*

[42] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).

[43] Okrent, *supra*, at 3.

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[44] In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixture blood of White, Indian, and negro." Exhibit G, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." *Id.* at H2462.

Chairman Johnson soon convened hearings on new immigration legislation. *See* Exhibit H, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 (1926). At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." Ex. H, at 29. In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." *Id*. Representative Box added, "I have some letters, Mr. Chairman, just like that." *Id.*

---

[44] Gonzalez O'Brien, *supra*, Chap. 1.

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was Dr. Laughlin. Ex. C, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." *Id.* at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." *Id.* at 4. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." *Id.* at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes." *Id.* at 19. The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." *Id.* By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." *Id.*

20

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. *Id.* at 25. Representative Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." *Id.*

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." *Id.* at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." *Id.* at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." *Id.* at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." *Id.* Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" *Id.* at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this

principle in our immigration policy we will be well repaid for our efforts." *Id.* at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Exhibit I, S. Rep. No. 1456, at 1 (1929). This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Ex. I at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit J, Senator Blease (SC). *Congressional Record* (Jan. 23, 1929) p. S2092. The full Senate passed the bill with almost no discussion or debate. Ex. J, at S2092. Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. *See* Exhibit K, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929.

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been

making a just fight against this situation for years." Ex. D at H3619.

Representative Blanton urged the House to "apprehend the thousands of these

Mexicans who are in Texas now unlawfully and put them back across the Rio

Grande and keep them there." Ex. D at H3619. Representative Schafer added that

"[t]hese Mexicans also come into Wisconsin in droves," and Representative

Blanton challenged others to visit the international ports of entry in Texas to see

the "hordes that come across the bridges with no intention of ever going back." Ex.

D at H3619. Representative Fitzgerald then added that from a "moral standpoint,"

Mexicans were "poisoning the American citizen" because they are "of a class" that

is "very undesirable." Ex. D at H3620.

Minutes later, the bill passed the House of Representatives. Ex. D at H3621.

The president signed it into law three days later.

This legislative history easily clears the low threshold of showing that

racism and eugenics were a "motivating factor" under the first three factors. Like

other *Arlington Heights* cases, passage of the racially-motivated law followed a

predictable pattern. A broad social movement founded on principles of white

supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*,

471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South

to disenfranchise blacks"). Dr. Laughlin, a eugenics "expert," promoted theories of

racial inferiority through multiple reports and testimony to Congress. Key

lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along

23

with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). Other legislators expressed similar sentiments. *See id.* And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—if not exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

### 4.   The fourth factor (deviations from procedural norms) shows a discriminatory purpose because Congress relied on eugenics and race vitriol.

Examining the fourth *Arlington Heights* factor – whether a decisionmaker departs from "normal procedures or substantive conclusions" – requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g., Ave 6E Investments,* 818 F.3d ay 507 (citing the city's decision to "disregard the zoning advice of its own experts" as evidence of discriminatory intent).

Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities, and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965, illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans, even though Canadians were also entering the United States in record numbers. *See* Ex. D at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board – regardless of race. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about *Mexicans* taking jobs, not Canadians. *See* Ex. D at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and

racism, it also departed from typical substantive conclusions underlying immigration law.

*    *    *

This record demonstrates that racial animus was a motivating factor in the passage of the Undesirable Aliens Act. As Professor Lytle Hernández testified, "the illegal reentry provision of the 1929 law was intended to target Latinos." Exhibit L, Testimony of Professor Kelly Lytle Hernández, p. 34. For this reason, Chief Judge Du found that "racial animus was a strong motivating factor in the passage of the Act of 1929." *Carrillo-Lopez,* 2021 WL 3667330 at *9; *see also Machic-Xiap,* 2021 WL 3362738 at *12 (characterizing the Undesirable Aliens Act as "serv[ing] two racist purposes" – it "furthered nativists' desire to separate certain immigrants from the general population by attaching criminal penalties like imprisonment" while at the same time giving "southwestern agribusiness greater ability to exploit these immigrants" by allowing farmers to use "the threat of deportation as leverage over this immigrant labor").

In short, Congress was motivated by racial animus when it enacted the Undesirable Aliens Act and criminalized reentry.

## C.     The 1952 Recodification Did Not Cleanse the Unlawful Reentry Statute of its Racist Origins

When Congress passed the INA in 1952, it recodified the Undesirable Aliens Act's criminalization of reentry at 8 U.S.C. § 1326. Section 1326 adopted the

language from the Undesirable Aliens Act "almost word for word." *Carrillo-Lopez*, 2021 WL 3667330 at *7, while other portions of the INA broadened the grounds for deportation and limited discretionary relief from deportation. President Truman harshly criticized the INA, noting it was "most unfortunate" that the bill "would impose harsher restrictions and greatly increase the number of cases deserving equitable relief" while at the same time "narrow[ing] the circle of those who can obtain relief from the letter of the law." Exhibit M, President Truman's statement on "Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952, at p. 9.

The 1952 Congress was aware of the disparate impact the criminalization of reentry had on Latinxs, and it was aware of its racist underpinnings – but, it engaged with neither, and overrode President Truman's veto, which explicitly called out the law's discriminatory intent. The only meaningful change Congress made to the statute was expanding it (at the behest of Deputy Attorney General Payton Ford, who included the racial slur "wetback" in his request) to cover those who – like Mr. Rodriguez-Arevalo are "found in" the United States. *See* 8 U.S.C. § 1326(a)(2).

Recodification does not automatically reset legislative intent. While it is possible for recodification of a racially motivated law to cure the original law's discriminatory intent, that happens only where the legislature actively engages with

the prior statute and makes substantive changes. *See Abbott v. Perez*, 138 S. Ct. 2305 (2018).

This intuitive understanding of legislative intent is reflected in the Supreme Court case law: "It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." *United States v. Ryder*, 110 U.S. 729, 740 (1884). "[W]e do not presume that the revision worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *Keene Corp. v. United States,* 508 U.S. 200, 209 (1993)(cleaned up).

"[A] prior version of a statute known to be motivated by racial animus may be considered as infecting is present iteration if it was not, in fact, substantially altered." *Carrillo-Lopez,* 2021 WL 3667330 at *10 (citing *Hunter,* 471 U.S. at 232-33) (finding that when a provision's original enactment was clearly motivated by racial animus, later changes did not "legitimate[]" the provision); *see also Ramos v. Louisiana,* 140 S. Ct. 1390, 1410 (Sotomayor, J., concurring) (noting that "many laws and policies in this country have had some history of racial animus" and citing to *United States v. Fordice*, 505 U.S. 717, 729 (1992) for the proposition that "policies that are 'traceable' to a State's *de jure* racial segregation and that still 'have discriminatory effects' offend the Equal Protection Clause").

While the Supreme Court upheld the recodification of a racially-discriminatory law in *Abbott*, it only did so because the legislature actively

28

engaged with the prior statute and made substantive changes. The Supreme Court upheld a 2013 redistricting plan that replaced a 2011 plan after the 2011 plan was found to have been enacted with discriminatory intent. The crucial distinction here is that, in *Abbott*, the 2013 legislature enacted an entirely new redistricting plan explicitly created to "fix the problems identified" (i.e, the discriminatory intent behind the 2011 plan), 138 S. Ct. at 2329, whereas § 1326 was nearly identical to the original unlawful reentry statute.

The Supreme Court made clear in *Abbott* that the legislature's original intent remains relevant to determining the intent of the reenacting legislature "to the extent that [it] naturally give[s] rise to – or tend[s] to refute – inferences regarding the intent of the [reenacting legislature]." *Id.* at 2327.[45] In that particular case, the Supreme Court found the reenacting legislature lacked discriminatory intent precisely because of the way that it responded to the challenged provision, i.e., the fact that the 2013 legislature had taken care "'not to incorporate . . . any legal defects'" from the 2011 plan. *Id.* at 2315 (quoting *Perry v. Perez*, 565 U.S. 388,

---

[45] To the extent *Abbott* suggests any kind of presumption of a legislature's good faith, such presumption is limited to redistricting cases. *See Abbott*, 138 S. Ct. 2324 ("in assessing the sufficiency of a challenge *to a districting plan*,' a court 'must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus' . . . [a]nd the 'good faith of the legislature must be presumed'") (citing *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995) (emphasis added). As Chief Judge Du notes, both *Abbott* and *Miller* justify this presumption on the complexity of redistricting – and there is no reason to believe that such a presumption would carry over into a different statutory scheme, particularly where it has been shown that the original legislation was motivated by racial animus and the reenacting legislation is nearly identical. *See Carrillo-Lopez,* 2021 WL 3667330 at *10 n. 21.

394 (2012)). In so doing, the Supreme Court stressed that the legislature "did not reenact the plan previously passed by its 2011 predecessor" and therefore had not "carried forward the effects of any discriminatory intent on the part of the 2011 Legislature." *Id.* at 2325. The Supreme Court concluded "*Under these circumstances,* there can be no doubt about what matters: It is the intent of the 2013 Legislature." *Id.* (emphasis added).

With regard to §1326, the 1952 Congress – unlike the legislature in *Abbott* – did not engage with the disparate impact or discriminatory purpose behind the original legislature. Rather it recodified a racist law without debate, altering it only to make it more punitive, and knowingly "carried forward the effects" of the Act's discriminatory intent (i.e., the disparate impact on Latinxs).

*Abbott* does not shield reenacting legislation from scrutiny where the legislature passes a nearly-identical law without acknowledging, much less addressing, the prior legislation's discriminatory motive or disparate effect. When Congress carries forward legislation that was motivated by racial animus and has produced racially-disparate results (and does so over a presidential veto explicitly calling out the racism of the legislation), it takes no mental gymnastics to find that racial animus remained a motivating factor.

The 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry statute – without debate on (and with full knowledge of) the

statute's discriminatory intent and disparate impact – establishes discriminatory intent under *Arlington Heights*.[46]

### D.     The 1952 Congress Acted with a Discriminatory Purpose When it Recodified the Provision of the Undesirable Aliens Act Criminalizing Reentry

In addition to the failure to address, much less repudiate, the discriminatory intent behind the original unlawful reentry statute, there is significant contemporaneous evidence that the 1952 Congress itself acted with discriminatory intent in recodifying that statute. Applying the *Arlington Heights* factors to the 1952 recodification of §1326, it's clear racial animus was a motivating factor.

### 1.     The first factor (the law's historical background) shows a discriminatory purpose because the racism of 1929 had not dissipated in 1952

The racial animus underpinning the Undesirable Aliens Act of 1929 informs the 1952 Congress's recodification of the unlawful reentry provision. In *Carrillo-Lopez*, Chief Judge Du rightly "incorporate[d] by reference this prior evidence of the historical background motivating the passage of Section 1326 in 1952." 2021 WL 3067330 at *9.

The anti-Latinx racism that motivated Congress in 1929 did not dissipate over the years leading up to the passage of the INA in 1952.  White supremacy was alive and well throughout this time. Schools were segregated, *see, e.g.,*

---

[46] In *Carrillo-Lopez*, Chief Judge Du suggested, without deciding, that she "might be persuaded that the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint." 2021 WL 3667330 at *9.

*Westminster Sch. Dist. of Orange Cty. v. Mendez*, 161 F.2d 774, 781 (9th Cir. 1947) (holding that the "segregation of school children of Mexican descent" violated the Fourteenth Amendment), and anti-miscegenation laws were on the books in numerous states. *See Loving*, 388 U.S. at 7 (noting a state court had, in 1955, upheld an anti-miscegenation law as "an endorsement of the doctrine of White supremacy" and an attempt to prevent "a mongrel breed of citizens").

Between 1929 and 1952, there were two major historical events bearing on the Latinx population: the "repatriation drives" of the Great Depression and the subsequent "Bracero Program." Both events demonstrate the United States' intent to prevent Latinxs' permanent settlement and to maintain control over a temporary and exploitable Latinx workforce.

The so-called "repatriation drives" carried out during the Great Depression amounted to a government-led campaign of intimidation and coercion against the Latinx population in the United States. As Professor Gonzalez O'Brien testified in *Carillo-Lopez*, "this was a campaign that was meant to fuel voluntary repatriation . . . driven by a sense of the threat of deportation or the threat of additional penalties if those individuals did not return to Mexico." Exhibit L, Testimony of Professor Benjamin Gonzalez O'Brien at p. 88. The campaign achieved its purpose, driving millions of Latinx – many, if not most, of whom were U.S. citizens – out of the United States. California has since apologized to the "estimated two million people

32

of Mexican ancestry [who] were forcibly relocated to Mexico, approximately 1.2 million of whom had been born in the United States."[47]

Not long after this mass expulsion of Latinx, the United States entered World War II, finding itself in need of cheap labor. In 1942, the United States started the Mexican Farm Labor Program, also known as "Operation Bracero" or the "Bracero Program." The idea was to funnel Latinx labor into the United States on a legal and temporary basis, while ensuring decent wages and human treatment for laborers. But the reality was that Braceros were lured to the United States only to be brutalized. They were subjected to medical inspections that required them to strip naked and involved invasive inspections and "being gassed systematically with DDT." Ex. L at pp. 76-77. The protections they were promised were routinely ignored. Ex. L at p. 78. They were exploited and subjected to back-breaking labor because of their race. As Professor Lytle Hernandez testified, the Braceros were mistreated because of the stereotype "that they, as a racial group . . . were more stout and close to the ground and sort of fit for this kind of labor, and so they didn't need the accoutrement that others did." *Id.* When they were no longer needed, they were sent back to Mexico.[48]

---

[47] California Apology Act for the 1930s Mexican Repatriation Program (effective January 1, 2006), 2005 Cal SB 670.

[48] In 1948, a plane returning Braceros to Mexico crashed in central California, killing all of the 100 people onboard. News accounts gave the names of the crew and an immigration officer – and listed the others simply as "deportees." *Passengers on doomed 1948 flight, their names now emerge from shadows,* Los Angeles Times (July 10, 2013), available at

Both the "repatriation drives" of the Great Depression and the subsequent "Bracero Program" demonstrate that anti-Latinx racism remained prevalent in the years leading up to the passage of the INA in 1952. This history of racism manifested itself in countless other ways over the years, including the 1943 Sleepy Lagoon Trial in Los Angeles (a mass murder trial of 22 Latinx defendants, during which a sheriff's captain testified that "the Mexican element" had an innate "desire to use a knife or some other lethal weapon . . . his desire is to kill, or at least, let blood") and the subsequent Zoot Suit Riots (10 days during which mobs of U.S. servicemen in Los Angeles took to the streets and beat Latinx youths with impunity).[49]

This anti-Latinx racism remained prevalent in 1952, as evidenced by Congress's passage of Senate Bill 1851 (the so-called "Wetback Bill") that year. This bill's passage is particularly probative for two reasons. First, it was passed by

---

https://www.latimes.com/local/la-me-deportees-guthrie-20130710-dto-htmlstory.html (last visited Jan. 31, 2022). This inspired Woody Guthrie to write his classic song "Deportee"

> Oh, the sky-plane caught fire over Los Gatos Canyon,
> A fireball of lightning that shook all our hills.
> Who are these friends who are falling like dry leaves?
> The radio said, "They're just deportees."
> Goodbye to my Juan, goodbye Roselita,
> Adios mis amigos, Jesús y María.
> You won't have a name when you ride the big airplane,
> All they will call you will be "deportees."

[49] *See Zoot Suit Riots: After 75 years, L.A. looks back on a violent summer,* Los Angeles Times (June 4, 2018), available at: https://www.latimes.com/local/lanow/la-me-ln-zoot-suit-riots-anniversary-20180604-story.html (last visited Jan. 31, 2022).

the same Congress that, just two months later, would recodify the unlawful reentry provision of the Undesirable Aliens Act. Second, it shared the aim of preventing unlawful immigration (its stated purpose was to "assist in preventing aliens from entering or remaining in the United States illegally").[50]

The 1952 Congress's debate and passage of the Wetback Bill is relevant historical background demonstrating the open racism of the legislature that would enact §1326 only two months later. "[T]hroughout the debate [on the bill], Mexican undocumented entrants [were] regularly referenced as wetbacks," the debate focused on the "wetback problem," and legislators suggested that individuals "may be criminals because they are wetbacks." Ex. L at pp. 95-97, 107. The fact that the 1952 Congress openly used the racial slur "wetback" to refer to Mexicans – while debating the "Wetback Bill" – is illustrative of the open racial animus of the 1952 Congress.

Professor Gonzalez O'Brien testified that the "term 'wetback' is one that is racially derogatory, was recognized as being derogatory at the time," and "across the period of the 1940s and 1950s [was] associated . . . almost synonymous with Mexicans." Ex. L at p. 90. "[W]hile the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose." *La Union del*

---

[50] Pub. L. No. 82-283, 66 Stat. 26 (1952).

*Pueblo Entero v. Ross*, 353 F. Supp.3d 381, 395 (D. Md. 2018). The use of the term "wetback" "evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people." *Carrillo-Lopez,* 2021 WL 3667330 at *13.

> ### 2. The second factor (events leading up to the law) shows a discriminatory purpose because the 1952 Congress passed related legislation using racial slurs

The specific sequence of events leading to the 1952 Congress's recodification of the Undesirable Aliens Act's reentry provision is trouble for two reasons. First, as discussed *supra*, the same Congress passed the "Wetback Bill" two months prior. Second, Deputy Attorney General Peyton Ford wrote to the Chairman of the Committee on the Judiciary on behalf of the Department of Justice, included the racial slur "wetback" and requested the one and only substantive change to the statute – the expansion of the law to cover those "found in" the United States. Exhibit N, Statement of Peyton Ford, Deputy Attorney General, p. 6. As the letter makes clear, this change was expressly designed to make it easier for the government to establish venue in criminal prosecutions. *Id.* at p. 6.

Deputy Attorney General Ford was not some fringe figure shooting off a letter to his representative. He was the second-highest ranking Department of Justice official and was providing "the views of the Department of Justice." *Id.* at p. 1. Based on his request alone (the congressional record does not appear to

contain any other comment on what is now §1326), the 1952 Congress expanded the reentry statute so that venue would lie wherever a reentering immigrant was found.[51]

This sequence of events demonstrates that "[t]he 1952 Congress's silence does not evince a neutral viewpoint but worked to expand the enforceability of an admittedly racist law." *Carrillo-Lopez*, 2021 WL 3367330 at *14.

### 3. The third factor (legislative history) shows a discriminatory purpose because the 1952 Congress overturned a presidential veto calling out the INA's racism

The 1952 Congress's racial animus is also demonstrated by its overriding of President Truman's veto of the INA, which explicitly called out the racism of the Act. On June 25, 1952, President Truman vetoed the INA and issued a veto statement. *See* Ex. M. He condemned the INA as "legislation which would perpetuate injustices of long standing" and "intensify the repressive and inhumane aspects of our immigration procedures." *Id*. at p. 2. He expressed dismay that so much of the INA "would continue, practically without change" discriminatory immigration laws. *Id.* at p. 3. He admonished that it was "the time to shake off this dead weight of past mistakes . . . time to develop a decent policy of immigration . . . and a true reflection of the ideals we stand for, at home and abroad." *Id.* at p. 5.

---

[51] But for this expansion, the government would have no jurisdiction to prosecute Mr. Rodriguez-Arevalo in this district.

Two days after President Truman issued his veto statement, Congress overrode the veto and passed the INA. By overriding a presidential veto that explicitly called out the INA's racism, there is no doubt of the racial animus underpinning the INA. "Congress's failure to heed President Truman's call to 'reimagine' immigration while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Carrillo-Lopez*, 2021 WL 3667330 at *12.

### 4. The fourth factor (deviations from procedural norms) shows a discriminatory purpose because the 1952 Congress knew about §1326's racist origins – and said nothing.

As noted above, examining whether the legislature departed from "normal procedures or substantive conclusions" requires courts to consider any procedural irregularities leading up to the enactment of a law as well as any illogical or counter-intuitive conclusions in the decision-making process. Here, there were three such departures.

First, Congress's passage of the "Wetback Bill" two months prior to the recodification of the illegal reentry statute represents an illogical and counter-intuitive irregularity leading up to the enactment of §1326. This is because of the incongruity between the stated intent of the "Wetback Bill" and Congress's actual intent, as demonstrated by the language of the statute. While the bill's stated aim was to prevent "aliens from entering or remaining in the United States illegally,"

38

the law worked to shield employers from prosecution ("for the purposes of this section, employment . . . shall not constitute harboring").[52] It was obvious then as now that the lure of employment was the primary reason Latinxs were coming to the United States unlawfully. For many reasons, employers are vastly more responsive to deterrence than impoverished immigrants, and the most effective means of deterring "aliens from entering or remaining in the United States illegally" is therefore to punish employers who hire such immigrants. The import here is that the 1952 Congress, despite its avowed interest in limiting unlawful immigration, was in fact furthering the racist compromise introduced by the 1929 Congress: preserving American industry's access to cheap and exploitable Latinx labor while punishing Latinxs who provided that labor. The 1952 Congress's "criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted §1326 only two months later." *Carrillo-Lopez*, 2021 WL 3667330 at *15.

Second, the 1952 Congress's decision to expand the jurisdictional reach of the unlawful reentry statute based on a letter from the Deputy Attorney General that openly referred to Mexicans as "wetbacks" is procedurally irregular and evidences racial animus.

Third, the 1952 Congress's lack of debate regarding §1326, when Congress knew of the law's disparate impact on Latinxs and when other provisions of the

---

[52] Pub. L. No. 82-283, 66 Stat. 26 (1952).

INA were discussed and debated at length, is an irregularity demonstrating Congress's discriminatory intent. This is particularly the case given that the 1952 Congress expanded the grounds for deportation, restricted discretionary relief from deportation, and expanded the scope of the unlawful reentry provision. As Professor Gonzalez O'Brien testified, the lack of discussion of the unlawful reentry provision of the INA suggests an acceptance of its racist history. *See* Ex. L at p. 181. The 1952 Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage.[53] Despite having every opportunity to examine the unlawful reentry's provision's history and clarify it was recodifying that provision for a legitimate, non-discriminatory purpose, the 1952 Congress ignored the express racism behind the original statute and its disparate impact on Latinxs. "When considered in comparison with the express debate over other racially problematic predecessor statutes, Congress' silence here weighs in favor of establishing" the 1952 was motivated by racial animus – particularly given "its decision to expand the grounds for deportation and carceral punishment, despite its knowledge of the disparate

---

[53] Hernández, supra, at 138-139 n. 6 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years 1931-36); *see also* Ex. A, Hernández Dec. at p. 8; *see also* Exhibit O (S. Rep. No. 1515, Apr. 20, 1952) at 654-56 (regarding testimony from the Immigration and Naturalization Service that refers exclusively to Mexicans and recommends carrying forward the 1929 legislature).

impact of this provision on Mexican and Latinx people." *Carrillo-Lopez*, 2021 WL 3667330 at *11, 15.

* * *

When the 1952 Congress recodified the Undesirable Aliens Act's unlawful reentry statute at 8 U.S.C. §1326, it chose to ignore the original statute's racist history and to expand a law it knew disparately impacted Latinx people. In so doing, the 1952 Congress was motivated, at least in part, by racial animus. As Professor Gonzalez O'Brien observed, Congress's passage of §1326 "was largely driven by the same things that drove the original codification of [the unlawful reentry statute]; and that was, in part, a desire to control access to Mexican labor, and also a tendency to view Mexicans, individuals from south of the Rio Grande, and at least in the terms of the 1950s, the wetback, as a problematic population." Ex. L at pp. 131. For these reasons, Chief Judge Du rightly concluded that "the totality of the evidence shows that the same factors motivating the passage of [the illegal reentry statute] in 1929 were present in 1952" – meaning, "racial animus was at least one motivating factor behind the enactment of Section 1326." *Carrillo-Lopez*, 2021 WL 3667330 at *16, 10.

### 5. New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's Constitutionality

Two recent Supreme Court cases confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its

41

constitutionality. In *Ramos v. Louisiana*, the Supreme Court struck down a state law permitting criminal convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." *Ramos*, 140 S. Ct. at 1401 (emphasis in original). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the law's original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id.* at 1401 n. 44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). In that case, the majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id.* at 2259.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of the law where states have "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted). Justice Alito then stated, "But I lost,

and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at 2273 (quoting *Ramos*, 140 S. Ct. 1396 n. 44).

Here the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952. But *Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint.

The Government may also argue that even if racism and eugenics were a "motivating factor" in §1326's original passage, the law currently serves other legitimate purposes. But laws enacted with a discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision). Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id., see also Fordice*, 505 U.S. at 730 (if the State perpetuates policies and practices traceable to its prior *de jure*

dual system that continue to have segregative effects -whether by influencing

student enrollment decisions or by fostering segregation in other facets of the

university system – and such policies are without sound educational justification

and can be practically eliminated, the policies violate the Clause, even though the

State has abolished the legal requirement that the races be educated separately and

has established racially neutral policies not animated by a discriminatory purpose.).

### E.   Mr. Rodriguez-Arevalo has Demonstrated Disparate Impact and Discriminatory Purpose, so the Burden Shifts to the Government

Mr. Rodriguez-Arevalo has met his burden under *Arlington Heights.*

Therefore, the burden shifts to the government to establish that "the same decision

would have resulted even had the impermissible purpose not been considered."

429 U.S. at 270 n. 21.

The government has previously conceded that the Undesirable Aliens Act

was motivated by racial animus. The 1952 Congress did not acknowledge, address,

examine or denounce that history when it recodified the criminalization of illegal

reentry in §1326, thus its enactment of that statute was itself motivated by

discriminatory intent. While Congress has since amended §1326 to make it *more*

punitive, it has never addressed the racism that motivated the original unlawful

reentry statute or its recodification – "at no point has Congress confronted the

racist, nativist roots of Section 1326." *Carrillo-Lopez*, 2021 WL 3667330 at *24.

There is no evidence that the Congress acted with nondiscriminatory motivation –

i.e., that the same decision would have resulted even had the impermissible purpose not been considered – when it first criminalized reentry in the Undesirable Aliens Act or when it recodified that statute at §1326.

## V.    CONCLUSION

Congress was undoubtedly motivated by racial animus when it first criminalized reentry in 1929 as a compromised designed to keep "mongrels," "peons" and "rat men" from poisoning the Anglo-American gene pool, while still allowing captains of American agribusiness to import cheap Latinx labor. Twenty-three years later, Congress was again motivated by racial animus when it doubled down on this racist deal by making it easier for the government to lock up Latinxs while exempting employers from prosecution.

This racist law has been on the books for nearly a century, and it has done incalculable damage. It has stigmatized and degraded countless Latinxs and torn their families apart. It gave rise to the Trump Administration's "zero tolerance" policy of prosecuting "100 percent of illegal Southwest Border crossings"[54] (illustrating that the racial animus of the 1920s and 1950s remains with us, as visa overstays – not border crossings – account for the vast majority of unlawful

---

[54] Dept. of Justice, "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," May 7, 2018, available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions (last visited Feb. 7, 2022).  This same "zero tolerance" policy was behind the intentional and unconscionable separation of thousands of Latinx children from their families. *See, e.g., Ms. L. v. U.S. Immigration and Customs Enforcement,* 302 F.Supp.3d 1149 (S.D. Cal. 2018).

immigration to the United States[55]) and Operation Streamline's en masse hearings with dozens of brown-skinned men shackled and crammed into federal courtrooms to be jointly arraigned, pled and sentenced – all in one hearing.[56]

This mockery of due process and our founding ideals has sparked a reckoning with the sordid history of our criminal immigration laws. In December 2019, Representative Jesús G. "Chuy" García of Illinois (who was born in Mexico, the son of a farm laborer who came to the U.S. under the "Bracero Program") introduced the New Way Forward Act, which would repeal §1326. In his introductory remarks on the House floor, Representative García recognized that "[a]t this moment in history, we are called to uphold our values of compassion, common humanity, and racial justice." He argued that "[o]ur communities deserve dignity, restoration and repair, not further criminalization." And he urged support for his bill to "correct[] racial and anti-immigrant injustices embedded in our

---

[55] *See The Real Illegal Immigration Crisis Isn't on the Southern Border*, The Atlantic, Apr. 19, 2019 (noting that, for the past decade, "visa overstays in the United States have outnumbered border crossings by a ratio of about 2 to 1).

[56] *See Assembly-Line Justice: A Review of Operation Streamline*, University of California, Berkley Law School, The Chief Justice Earl Warren Institute on Race, Ethnicity & Diversity, Jan. 2010 ("The sheer number of defendants requires nearly all judges to combine the initial appearance, arraignment, plea and sentencing into one en masse hearing.  Many Operation Streamline defendants complete the entire criminal proceeding --  meeting with counsel, making an initial appearance, pleading guilty, and being sentenced after waiving a presentence report – in a single day.  Criminal Justice Act (CJA) Panel attorneys serve as counsel for the majority of the defendants and are appointed to represent up to 80 clients in one hearing, which can foreclose individualized representation.").

immigration laws, many of which have enabled Trump Administration's inhumane assault on non-citizens in the United States and at our Southern border."[57]

Representative García's eloquent appeal recognizes that §1326 was motivated by anti-Latinx racism and continues to visit injustice on Latinxs in our community. The Constitution entrusts the judiciary with the responsibility of scrutinizing legislation motivated by racial animus to ensure that such injustices are thwarted.

Mr. Rodriguez-Arevalo respectfully asks that the Court find that 8 U.S.C. § 1326 violates the Fifth Amendment's equal protection guarantee and dismiss the indictment against him.

Respectfully submitted,

Date: March 11, 2022

*/s/ Ari D. Weitzman*
ARI D. WEITZMAN, ESQUIRE
Asst. Federal Public Defender
Attorney ID# PA81927

*/s/ Amanda R. Gaynor*
AMANDA R. GAYNOR, ESQUIRE
Staff Attorney
Attorney ID# PA204831

100 Chestnut Street, 3rd Fl.
Harrisburg, PA  17101
Tel. No. 717-782-2237
Fax No. 717-782-3881
*ari_weitzman@fd.org*
*amanda_gaynor@fd.org*

---

[57] *Congressional Record*, Dec. 10, 2019, at E1571-72, available at https://www.congress.gov/116/crec/2019/12/10/CREC-2019-12-10-pt1-PgE1571-4.pdf (last visited Feb. 7, 2022).

**CERTIFICATION OF WORD COUNT**

I, Ari D. Weitzman, Esquire, Assistant Federal Public Defender, certify that

The body of the Brief contains 11, 253 words;

I make this combined certification under penalty of perjury, pursuant to 28

U.S.C. § 1746.


Date:  March 11, 2022                          /s/ Ari D. Weitzman
                                               ARI D. WEITZMAN, ESQUIRE
                                               Asst. Federal Public Defender
                                               Attorney ID# PA81927
                                               100 Chestnut Street, 3rd Fl.
                                               Harrisburg, PA  17101
                                               Tel. No. 717-782-2237
                                               Fax No. 717-782-3881
                                               ari_weitzman@fd.org
                                               Attorney for Cesar Rodriguez-Arevalo

48

## CERTIFICATE OF SERVICE

I, Ari D. Weitzman, Esquire, Assistant Federal Public Defender, do hereby certify that I served a copy of the foregoing **Brief in Support of Motion to Dismiss Indictment**, via Electronic Case Filing, and/or by placing a copy in the United States mail, first class in Harrisburg, Pennsylvania, and/or by hand delivery, addressed to the following:

JOANNE SANDERSON, ESQUIRE
*joanne.sanderson@usdoj.gov*


CESAR RODRIGUEZ-AREVALO


Respectfully submitted,

Date:  March 11, 2022

*/s/ Ari D. Weitzman*
ARI D. WEITZMAN, ESQUIRE
Asst. Federal Public Defender
Attorney ID# PA81927
100 Chestnut Street, 3rd Fl.
Harrisburg, PA  17101
Tel. No. 717-782-2237
Fax No. 717-782-3881
*ari_weitzman@fd.org*
*Attorney for Cesar Rodriguez-Arevalo*