**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 1:19-cr-0281** |
| | : | |
| **v.** | : | **(Judge Wilson)** |
| | : | |
| **CESAR RODRIGUEZ-AREVALO,** | : | |
| **Defendant** | : | |

**UNITED STATES OF AMERICA'S BRIEF IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

JOHN C. GURGANUS
UNITED STATES ATTORNEY

 /s/ *Joanne M. Sanderson*
Joanne M. Sanderson
Assistant United States Attorney
PA315327
Joanne.Sanderson@usdoj.gov
228 Walnut Street, Suite 220
Harrisburg, PA 17108-1754
717-221-4482; 717-221-2246(f)

Dated: March 25, 2022

# TABLE OF CONTENTS

I.  **Introduction**.................................................................................................1

II.  **Statement of Facts**........................................................................................2

III.   **Argument**..................................................................................................3

   A.   Statutory Background..............................................................................3

   B.   Defendant Fails to Establish an Equal Protection Violation.........................6

      1.   *Congress's immigration laws are subject to rational-basis review*..............7

      2.   *Section 1326 satisfies rational-basis review* ................................10

      3.   *Arlington Heights* ........................................................13

IV.  **Conclusion**.................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Aleman v. Glickman*,
   217 F.3d 1191 (9th Cir. 2000) ........................................................ 11

*Bolling v. Sharpe*,
   347 U.S. 497 (1954) ...................................................................... 7

*Breyer v. Meissner*,
   214 F.3d 416 (3d Cir. 2000) .......................................................... 8

*Cabrera v. AG U.S.*,
   921 F.3d 401 (3d Cir. 2019) .......................................................... 10

*Chen v. City of Hous.*,
   206 F.3d 502 (5th Cir. 2000) ........................................................ 17

*Cotton v. Fordice*,
   157 F.3d 388 (5th Cir. 1998) ........................................................ 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ........................................................ 12-13, 18

*Espinoza v. Mont. Dep't of Revenue*,
   140 S. Ct. 2246 (2020) .................................................................. 16

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ................................................................ 8, 13

*Graham v. Richardson*,
   403 U.S. 365 (1971) ...................................................................... 7

*Hampton v. Mow Sun Wong*,
   426 U.S. 88 (1976) ........................................................................ 7

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010) .......................................................... 17

*Heller v. Doe*,
509 U.S. 312 (1993) ........................................................................... 10

*Hunter v. Underwood*,
471 U.S. 222 (1985) ........................................................................... 15

*Johnson v. Governor of Fla.*,
405 F.3d 1214 (11th Cir. 2005) ........................................................ 17

*La. Forestry Ass'n v. Sec'y U.S. DOL*,
745 F.3d 653 (3d Cir. 2014) ............................................................. 14

*Mathews v. Diaz*,
426 U.S. 67 (1976) .............................................................................. 8

*Miller v. Johnson*,
515 U.S. 900 (1995) ............................................................................ 9

*Mitchell v. Comm'n on Adult Ent. Establishments*,
10 F.3d 123 (3d Cir. 1993) .............................................................. 23

*Mobile v. Bolden*,
446 U.S. 55 (1980) ........................................................................... 14

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) .......................................................................... 13

*Plyler v. Doe*,
457 U.S. 202 (1982) ............................................................................ 9

*Ramos v. Louisiana*,
140 S. Ct. 1390 (2020) ..................................................................... 15

*Sessions v. Morales-Santana*,
137 S. Ct. 1678 (2017) ........................................................................ 7

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ................................................................... 8, 11

*U.S. v. Cortez-Mendoza*,

  No. 2:20-CR-131, 2022 WL 706917 (E.D. Wash. Mar. 8, 2022) ...................... 3

*U.S. v. Felix-Salinas*,

  No. 5:21-CR-70-JA-PRL, 2022 WL 815271 (M.D. Fla. Mar. 17, 2022) ........... 3

*U.S. v. Hernandez-Lopez*,

  No. CR H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022) .......................... 3

*U.S. v. Maurico-Morales*,

  No. CR-21-298-R, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022) ...................... 3

*U.S. v. Medina-Zepeda*,

  No. CR 20-0057, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021) .......................... 3

*U.S. v. Ponce-Galvan*,

  No. 21-CR-02227, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022) ...................... 3

*U.S. v. Rivera-Sereno*,

  No. 2:21-CR-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021) ...................... 3

*U.S. v. Samuels-Baldayaquez*,

  No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021) .......................... 3

*U.S. v. Sifuentes-Felix*,

  No. 21-CR-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022) ...................... 3

*United States v. Cortez-Rocha*,

  394 F.3d 1115 (9th Cir. 2005) ................................................................. 9

*United States v. Flores-Montano*,

  541 U.S. 149 (2004) ................................................................................ 9

*United States v. Gutierrez-Barba*,

  No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021)

  ......................................................................................................... 3

*United States v. Hernandez-Guerrero*,

  147 F.3d 1075 (9th Cir. 1998) ............................................................... 11

*United States v. Machic-Xiap*,

    No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 3, 2021) ......................... 3

*United States v. Novondo-Ceballos*,

    No. 21-CR-383 RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021) .................... 3

*United States v. O'Brien*,

    391 U.S. 367 (1968) ................................................................... 22, 23

*United States v. Ruiz-Rivera*,

    No. 20-mj-20306, 2021 WL 4895956 (S.D.N.Y. Oct. 20, ?YEAR?) ............... 15

*United States v. Suquilanda*,

    No. 21 CR 263 (VM), 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021) ................ 3

*United States v. Wence*,

    No. 3:20-cr-0027, 2021 WL 2463567 (June 16, 2021) ....................................... 3

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

    429 U.S. 252 (1977) ................................................................... 10, 13

*Wayte v. United States*,

    470 U.S. 598 (1985) ................................................................... 7

## Statutes

8 U.S.C. § 1 ................................................................................ 5, 14

8 U.S.C. § 1325 ............................................................................ 15

8 U.S.C. § 1326 ................................................ 1, 2, 3, 6, 7, 9, 10, 11, 14, 15

8 U.S.C. § 2462 ............................................................................ 21

8 U.S.C. §§ 4, 43 .................................................................... 18, 20, 21

8 U.S.C. §§ 19, 39 ....................................................................... 4, 5

8 U.S.C. §§ 276, 66 ...................................................................... 6

8 U.S.C. §§ 7345, 102 ................................................................... 6

COMES NOW, the United States of America, by and through John C. Gurganus, United States Attorney for the Middle District of Pennsylvania, and Joanne M. Sanderson, Assistant United States Attorney, and hereby files its Opposition to Defendant's Motion to Dismiss the Indictment. [ECF No. 26, 27].

## I.    Introduction

For almost a century, federal law has made it a crime for a noncitizen previously ordered removed from the United States to reenter without proper authorization. Neither then nor now has the statutory language distinguished among noncitizens by their race or ethnicity, instead imposing criminal penalties on "any alien" who, after removal, enters, attempts to enter, or is found in the United States. 8 U.S.C. § 1326(a).

The Defendant in this case nevertheless asks this Court to find that Section 1326 violates the equal-protection component of the Fifth Amendment by discriminating against Mexican and Latinx individuals. [ECF No. 26, 27]. He alleges that Section 1326 has a disparate impact on such individuals; the Congresses that enacted both a predecessor statute in 1929 and Section 1326 in 1952 were motivated at least in part by discriminatory intent; and the amendments since that time do not suffice to "cleanse[] the statute" of its alleged taint.

A ruling invalidating a facially neutral federal statute based on the supposedly discriminatory intent of prior Congresses would be unprecedented and wrong. The motives of legislators decades ago is irrelevant and upon review of the current statute

under the rational-basis standard, which is the metric that governs equal-protection challenges to laws—such as Section 1326—that pertain to immigration controls, this Court should find that it passes constitutional muster because it serves the legitimate purpose of deterring violations of the country's immigration laws. To decide otherwise would cast aside Congress's repeated amendments to the illegal-reentry statute, and the sound justifications for the law. Doing so would similarly invalidate a widely applied statute and reach a result at odds with the decisions of every other court (but one) to consider the question.

## II.    Statement of Facts

Rodriguez-Arevalo is a native and citizen of El Salvador. On November 18, 2008, he was removed from the United States to El Salvador through Harlingen, TX. Rodriguez-Arevalo illegally re-entered the US on an unknown date and at an unknown place. On January 10, 2018, Rodriguez-Arevalo was arrested by the Waynesboro (PA) Police Department for various sex related acts. Pursuant to this arrest, ICE became aware of his presence and completed a fingerprint comparison which proved Rodriguez-Arevalo is a citizen of El Salvador, who was removed, and illegally re-entered the United States without permission.

On December 19, 2018, Rodriguez-Arevalo was convicted of two counts of Criminal Attempt - IDSI Forcible Compulsion, Indecent Assault Forcible Compulsion, Indecent Exposure, and Criminal Attempt - Rape Forcible

Compulsion.  Counts 1-3 were all consecutive sentences, for a minimum of 117 months. Rodriguez-Arevalo is currently in state custody with a minimum projected release date in 2027; however, the statute of limitations for the illegal re-entry offense began running upon his 2018 encounter.  Thus, on October 2, 2019, he was indicted for illegal re-entry under 8 U.S.C. §1326.

## III.   Argument

Defendant files this lengthy motion to dismiss alleging that § 1326 violates the Equal Protection Clause.  Countless courts across the country that have heard this issue based upon the arguments made by Defendant have rejected the motion.[1]  This Court should do the same.

### A.   Statutory Background

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as

---

[1] See e.g., *U.S. v. Felix-Salinas*, No. 5:21-CR-70-JA-PRL, 2022 WL 815271 (M.D. Fla. Mar. 17, 2022); *U.S. v. Cortez-Mendoza*, No. 2:20-CR-131, 2022 WL 706917 (E.D. Wash. Mar. 8, 2022); *U.S. v. Ponce-Galvan*, No. 21-CR-02227, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022); *U.S. v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *U.S. v. Sifuentes-Felix*, No. 21-CR-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022); *U.S. v. Maurico-Morales*, No. CR-21-298-R, 2022 WL 99996, at *1 (W.D. Okla. Jan. 10, 2022); *U.S. v. Rivera-Sereno*, No. 2:21-CR-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *U.S. v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *U.S. v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *U.S. v. Novondo-Ceballos*, No. 21-CR-383, 2021 WL 3570229 (D.N.M. Aug. 12, 2021); *U.S. v. Machic-Xiap*, No. 3:19-CR-407-SI, 2021 WL 3362738 (D. Or. Aug. 3, 2021); *U.S. v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D.V.I. June 16, 2021); *U.S. v. Gutierrez-Barba*, No. CR1901224001PHXDJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *U.S. v. Medina-Zepeda*, No. CR 20-0057, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021).

designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. However, there was no penalty, other than repeated deportation, for reentering after deportation. Accordingly, to enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018.[2] The Senate Report from the Committee on Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the proposed illegal reentry crime and stated, "It is believed that such a statute would be of material aid in enforcing our immigration laws." *Id.*

---

[2] The text stated,

> [I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years of by a fine of not more than $1,000, or by both such fine and imprisonment.

The Secretary of the Department of Labor—charged at that time with enforcing the country's immigration laws—agreed. In a letter made part of the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws." The Secretary continued,

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions. . . . Aside from the sexual immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

*Id.*

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction).[3] In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for reentry of a deported alien. The text stated,

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney

---

[3] By 1952, the antagonists in Defendant's motion were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or no longer alive (Coleman Blease, James Davis, John Box, Harry Laughlin).

General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Over the years, Congress has updated § 1326 multiple times—and always to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

### B.    Defendant Fails to Establish an Equal Protection Violation

The Court should deny Defendant's motion to dismiss. Immigration laws are subject to a highly deferential standard of review. With the proper standard in view— requiring Defendant, for instance, to negate "every conceivable basis which might

6

support" the illegal-entry law—Defendant's claim fails. The motion likewise fails because it ignores the Supreme Court's prohibition against probing alleged illicit legislative motives.

1.  *Congress's immigration laws are subject to rational-basis review*

Defendant's challenge to Section 1326 arises under the Fifth Amendment to the Constitution. Unlike the Fourteenth Amendment (which applies to the States), the Fifth Amendment does not contain an express equal-protection provision. Since 1954, however, the Supreme Court has construed the Amendment's guarantee of "due process of law" for all "person[s]," U.S. Const. amend. V, to provide analogous protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). And the Court has generally applied the same equal-protection standards in both contexts, *see Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985), meaning that any law drawing (for example) gender-based lines would have to satisfy heightened scrutiny. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017).

Federal immigration laws are an exception to that general rule. *Hampton v. Wong*, 426 U.S. 88, 100 (1976). While state statutes that distinguish between citizens and noncitizens remain subject to heightened scrutiny, *see Graham v. Richardson*, 403 U.S. 365, 371-72 (1971), the Supreme Court has taken a different approach to federal laws drawing such distinctions, in deference to the federal government's exclusive authority over immigration matters. "For reasons long recognized as valid," the Court has

explained, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (*quoting Mathews*, 426 U.S. at 81). "The reasons that preclude judicial review of political questions" thus "also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization," *Mathews*, 426 U.S. at 81-82—including congressional enactments that "regulate the admission and exclusion of aliens." *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977).

In the Third Circuit, the test "regarding immigration or naturalization, Congress need only have a "facially legitimate and bona fide reason."" *Breyer v. Meissner*, 214 F.3d 416, 422 (3d Cir. 2000) citing *Fiallo*, 430 U.S. at 792-4.  In the Third Circuit, *Fiallo*'s "facially legitimate and bona fide" test is "analytically equivalent to the rational basis test normally applied in equal protection cases." *Breyer*, 214 F.3d at 493 (citing other cases); *Kamara v. Att'y Gen. of U.S.*, 420 F.3d 202, 217–18 (3d Cir. 2005) (finding no judicial authority to substitute the court's political judgment for that of the Congress where doing so would "impermissibly tread upon the Congress' virtually exclusive

domain over immigration which are 'policy questions entrusted exclusively to the political branches of our Government, and the court has "no judicial authority to substitute our political judgment for that of the Congress"' (citing *Fiallo*); *DeSousa v. Reno*, 190 F.3d 175, 184 (3d Cir. 1999) ("disparate treatment of different groups of aliens triggers only rational basis review under equal protection doctrine. (citing *Francis v. Immigr. & Naturalization Serv.*, 532 F.2d 268, 272 (2d Cir. 1976).   In any event, given Congress' plenary authority over immigration, the illegal-reentry law would satisfy strict scrutiny.[4]

There is another related reason why § 1326—which criminalizes unlawful presence in the country—implicates only rational-basis review. The Supreme Court has made clear that "[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982). And when a class "'do[es] not constitute a suspect class' for equal protection purposes, a governmental policy that purposefully treats the [class] differently from [non-class members] need only be 'rationally related to legitimate legislative goals' to pass constitutional muster. *Lee v.*

---

[4] That is, it is legislation "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1326 achieves that interest in the most possible tailored way.

*City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) (quoting *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996). Accordingly, for classifications that apply to aliens illegally present in the United States, rational-basis review applies. *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 638 (3d Cir. 2002) ("This Court applies rational basis review to equal protection challenges in the area of admission or removal of aliens.")

A contrary conclusion would lead to a stark anomaly. Decisions such as *Fiallo* and *Hawaii* foreclose a searching judicial inquiry into legislative or executive motivations even when the political branches have drawn express distinctions that would trigger close scrutiny outside of the immigration context. It would be strange if courts were nonetheless required to probe deeply into legislative motives—"a substantial intrusion into the workings of" a coequal branch, *see Arlington Heights*, 429 U.S. at 268 n.18—when an immigration law that draws no such distinction on its face is alleged to discriminate based on race or national origin. Applying rational-basis review to challenges such as the one brought by Defendant avoids that odd result.

        2.    *Section 1326 satisfies rational-basis review*

The threshold for upholding distinctions in a statute under rational-basis review is extremely low. *Cabrera v. Att'y Gen. United States*, 921 F.3d 401, 404 (3d Cir. 2019). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The legitimate purpose "may be based on rational speculation unsupported by evidence

or empirical data." *Cabrera*, 921 F.3d at 404 (citing *FCC v. Beach Commc'ns., Inc.*, 508 U.S. 307, 315 (1993).)  "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000), (quoting *Heller*, 509 U.S. at 320).

As the background above shows, and as common sense suggests, the government has a legitimate interest in deterring illegal reentry. And there is a clear rational relationship between that interest and § 1326. "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (citing *Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with § 1326—a law seeking to deter all aliens from illegally reentering the country following deportation.

Defendant cites the higher percentage of illegal-reentry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY20, Border Patrol had 405,036 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last accessed 03/23/2022). Ninety-nine percent of those encounters (400,651) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020 (last accessed 03/23/2022). Those numbers are neither surprising nor illuminating of Congress' motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—including those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (concluding that disparate impact of DACA rescission for Latinos from Mexico—totaling 78 percent of DACA recipients—did not establish plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal

protection grounds") (citation omitted);[5] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

3. *Arlington Heights*

Defendant relies almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). That case, which involved a rezoning request to accommodate the placement of low-income housing— "which would probably be racially integrated" (*id.* at 258)—is inapplicable here. Indeed, Defendant fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws passed by Congress. And for good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. That does not comport with the plenary

---

[5] For this same reason, Defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* ECF No. 27 at 35-39.

power given to Congress over immigration policy and the narrow judicial review over such policymaking.

In any event, Defendant cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 659 (3d Cir. 2014). Nor can he escape the fact that § 1326 has been updated or modified—each time strengthened—multiple times by Congress, including in 1988, 1990, 1994, 1996, and 1997.

Defendant's motion waves away this lengthy congressional record, claiming that "later reenactments do not cleanse the law of its original taint." ECF No. 27 at 51. Under Defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below—is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that "carr [ies] over" from one law to the next. *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (pl. op.) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *cf. Thompson*, 403 U.S. at 225 (citing *O'Brien* and noting that "there is an element of futility in a judicial attempt

to invalidate a law because of the bad motives of its supporters" because, among other reasons, "it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons"); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (noting that "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase" when a larger legislative body is at issue).

The cases Defendant relies on for his "forever tainted" argument do not support it.[6] In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment requires a jury to find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment. Based on that analysis, the Court concluded that a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary, the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J.,

---

[6] At least one court found as much in a written order denying the same defense motion—directed at § 1325, not § 1326—in *United States v. Ruiz-Rivera*, No. 20-mj-20306-AHG, ECF No. 61 at 5-6 (S.D. Cal. Sept. 2, 2020) ("There is no support for Defendant's suggestion that § 1325(a)(1) should be judged according to the legislative history of the [Immigration Act of 1929], and Defendant has not attempted to argue that § 1325(a)(1) would be unconstitutional under an *Arlington Heights* analysis of relevant legislative history.").

dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing."). Defendant says the Court's discussion of the racial underpinnings of the state law drove the outcome. Instead, as the majority acknowledged, it was entirely superfluous. In any event, *Ramos* does not apply here because it does not involve immigration law and the concomitant deferential standard of review.

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly irrelevant. There, the Supreme Court considered whether application of a "no-aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. The Court did *not* find the provision unconstitutional because of any "checkered tradition," as Defendant suggests. ECF No. 27 at 50. That phrase appears in the opinion in response to the argument that a tradition arose in the late-19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). In other words, neither *Ramos* nor

*Espinoza* stands for the proposition Defendant claims—that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." ECF No. 27 at 51.

As a final example of Defendant's erroneous taint argument, several courts have recognized that, when a state reenacts a voting provision that was intentionally discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

In any event, even assuming that: (1) Defendant's "forever tainted" position is permissible, (2) it is permissible for the Court to probe the motives of Congress; and (3) *Arlington Heights* applies to probe the justifications of Congress' immigration actions, Defendant's claim still fails. To begin, Defendant fails to show a cognizable disparate

impact. As outlined above, the statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States—not discrimination. That alone is enough to reject Defendant's *Arlington Heights* analysis. *See, e.g.,* ECF No. 27 at 16-17, 49 (Defendant agreeing that *Arlington Heights* requires establishing that a law "disparately impacts a particular group"); *Regents*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Defendant's perspective that early immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. *See* https://history.state.gov/milestones/1921-1936/immigration-act (last accessed 03/23/2022). These facts do not comport with Defendant's view that Congress was actively developing legislation with the intent and purpose of discriminating against persons from Mexico.

Digging slightly deeper into Defendant's claims reveals that they are misleading. He focuses on a few representatives and a few selectively edited quotes. Even sticking with that cherry-picked sampling, the full quotations show that the representatives were concerned mostly with economic problems like protecting American jobs and conserving public resources. For instance, Defendant says that Rep. Thomas L. Blanton "complained that Mexicans 'come into Texas by hordes[.]'" ECF No. 27 at 30. But the full context shows Rep. Blanton was discussing the need to preserve jobs for American citizens. Indeed, just moments later, Rep. Blanton stated, "They are taking away jobs from American citizens." 70 Cong. Rec. 3619 (1929).

As another example, Defendant states that Rep. Blanton "urged the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." ECF No. 27 at 31. Defendant omits the very next sentence, which again is directly tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]" 70 Cong. Rec. 3619 (1929).

As yet another example, Defendant says Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'" ECF No. 27 at 31. Defendant inserted a period at the end of that quote, but it was actually a comma. The full quote—again job focused—reads:

> If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges . . . [a]nd stand there, he will see the hordes that come across the bridges with no intention of ever going back, *coming across to get jobs of Americans*, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

70 Cong. Rec. 3619 (1929) (emphasis added).

Another example of a misleading quotation is where Defendant quotes Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]" ECF No. 27 at 31. He cuts off Rep. Schafer's comments there. The full quote from Rep. Schafer shows that he was referring to preserving jobs. "These Mexicans also come into Wisconsin in droves, *and take the places of American citizens in the factories and on the farm*. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor." 70 Cong. Rec. 3619 (1929) (emphasis added).

Likewise, Defendant cites some startling comments of Rep. John Box, but Defendant omits his comments during the congressional debate regarding the job problems facing his constituents in Texas. "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now." *Id.*

Defendant also cites a "radio speech" given by Rep. Robert Green in January 1928, seizing upon several startling snippets. The complete speech shows Rep. Green was not targeting Mexicans. Rather, Rep. Green outlined his broad immigration policies, seeking a general strengthening of immigration law. Rep. Green saw a "tremendous situation" facing immigration authorities. 69 Cong. Rec. 2461 (1928). He observed that "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States." *Id.* He noted that the "immigration department" employed only 2,700 people, which was "inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol." *Id.* Rep. Green stated that 113,105 aliens were "inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses." *Id.* He continued, "[t]he economic loss represented by these figures is appalling." *Id.* Rep. Green spoke at length about the "communists" and "bolshevists"—not Mexicans—"here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our homes." *Id.* at 2462. He also spoke about immigration from Mexico, stating "hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises." *Id.* He also stated—regrettably, but clearly not singling out Mexicans—that it was "time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores." *Id.*

21

The point is not that these Congressmen did not say things they shouldn't have. It is that indulging even briefly in Defendant's desired probe of the Congressional record reveals a more complicated, multi-dimensional picture than the flat caricature painted by Defendant and shows that economic and other legitimate motives acted as a driving force behind the legislation. The endeavor also underscores the Supreme Court's caution—if not complete prohibition—against congressional motive-probing. *United States v. O'Brien*, 391 U.S. 367 (1968) sets out this longstanding principle. There, O'Brien burned his selective service registration certified and was convicted under a 1965 law criminalizing that behavior. *Id.* at 370. In the Supreme Court, O'Brien argued that the 1965 law was unconstitutional because the law's "purpose" was to suppress freedom of speech. *Id.* at 382-83. The Supreme Court rejected the argument, noting that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383. The Court cited a 1904 Supreme Court case which stated:

> The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.

*Id.* (quoting *McCray v. United States*, 195 U.S. 27, 56 (1904)). The *O'Brien* Court noted that the judiciary *can* look to statements by legislators "[w]hen the issue is simply the interpretation of legislation." *Id.* But outside that context, the Court found that it had no

authority to probe claimed motives of Congress. Speaking directly to the issue raised in

Defendant's motion, the Court stated,

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*Id.* at 384 (emphasis added); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292

(2000) ("Respondent's argument that the ordinance is 'aimed' at suppressing

expression through a ban on nude dancing . . . is really an argument that the city

council also had an illicit motive in enacting the ordinance. As we have said before,

however, this Court will not strike down an otherwise constitutional statute on the

basis of an alleged illicit motive.") (citing *O'Brien*); *Palmer v. Thompson*, 403 U.S.

217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate

equal protection solely because of the motivations of the men who voted for it.")

(citing *O'Brien* and other cases); *Mitchell v. Comm'n on Adult Ent. Establishments of

State of Del.*, 10 F.3d 123, 140 (3d Cir. 1993)("the court will not strike down otherwise

constitutional legislation on the basis of a 'speculated illicit legislative

motive.'")(internal citations omitted); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130

n.29 (9th Cir. 2005) ("The Supreme Court has held unequivocally that it 'will not

strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (citing *O'Brien*).

At the conclusion of the *Arlington Heights* analysis Defendant claims the government would have to show that the contested law would have passed "even had the impermissible purpose not been considered." ECF No. 27 at 51-52 (citing *Arlington Heights*). There is no need to reach this point. Still, Congress *did* pass a new illegal reentry law in 1952, which was later amended multiple times. Defendant does not suggest any discriminatory purpose with those pieces of legislation.

## IV.   Conclusion

Based upon the above, the United States requests this Court to deny the motion.

Respectfully submitted,

JOHN C. GURGANUS
UNITED STATES ATTORNEY

 /s/ *Joanne M. Sanderson*
Joanne M. Sanderson
Assistant United States Attorney
PA315327
Joanne.Sanderson@usdoj.gov
228 Walnut Street, Suite 220
Harrisburg, PA 17108-1754
717-221-4482; 717-221-2246(f)

Dated: March 25, 2022

<u>CERTIFICATE OF SERVICE</u>

Pursuant to Standing Order 03-1 and Local Rules 4.2 and 5.7, I hereby certify

that the foregoing document was served through electronic case filing.

Respectfully submitted,

JOHN C. GURGANUS
UNITED STATES ATTORNEY

 /s/ *Joanne M. Sanderson*
Joanne M. Sanderson
Assistant United States Attorney
PA315327
Joanne.Sanderson@usdoj.gov
228 Walnut Street, Suite 220
Harrisburg, PA 17108-1754
717-221-4482; 717-221-2246(f)

25