## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:19-CR-00281 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CESAR RODRIGUEZ-AREVALO | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion to dismiss the indictment filed by Defendant Cesar Rodriguez-Arevalo ("Rodriguez-Arevalo").  (Doc. 26.)  The motion alleges that the indictment should be dismissed because the statute under which Rodriguez-Arevalo was indicted violates his right to equal protection under the law pursuant to the Fifth Amendment of the United States Constitution.  (*Id.*)  For the following reasons, the court will deny the motion to dismiss the indictment.

### PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

Rodriguez-Arevalo is a native and citizen of El Salvador.  (Doc. 32, p. 8.) On November 18, 2008, he was removed from the United States to El Salvador through Harlingen, Texas.  (*Id.*)  On January 10, 2018, Rodriguez-Arevalo was

---

[1] Defendant noted in his brief in support of the motion, Doc. 27, that at least one other court addressing this issue held an evidentiary hearing.  (Doc. 27, p. 3, n.5.)  Rodriguez-Arevalo attached all evidence that was before the judge in *U.S. v. Carrillo-Lopez*, --- F.Supp.3d ---, 2021 WL 3667330, 2021 U.S. Dist. LEXIS 155741 (D. Nev. Aug. 18, 2021) as exhibits to the instant motion and indicated that the defense does not request an evidentiary hearing in this matter. Accordingly, no evidentiary hearing was held, and the court will refer to the briefs and exhibits for the findings of fact in this case.

arrested by the Waynesboro Police Department for various sex offense charges. (*Id*.)  A fingerprint comparison was completed, confirming his identity and that he was previously removed but had illegally re-entered the United States without permission.  (*Id*.)  On December 19, 2018, Rodriguez-Arevalo was convicted of numerous sex offenses and was sentenced to a minimum of 117 months of confinement.  (*Id*., at 8–9.)

On July 21, 2021, Rodriguez-Arevalo was charged by indictment with a single count of illegal reentry in violation of 8 U.S.C. § 1326.  (Doc. 26, ¶ 1.)  On August 13, 2021, Rodriguez-Arevalo appeared before Magistrate Judge Susan E. Schwab for an initial appearance and arraignment, at which time he entered a plea of "not guilty" to the Indictment.  (*Id.*, at ¶ 2.)

On March 11, 2022, Rodriguez-Arevalo filed the instant motion to dismiss the indictment, arguing that 8 U.S.C. § 1326 violates the Fifth Amendment's guarantee of equal protection.  (Doc. 26.)  Specifically, Rodriguez-Arevalo argues that 8 U.S.C. § 1326 was enacted with racially discriminatory intent and has a disparate impact on Latinx individuals, and is therefore unconstitutional under *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The Government filed a brief in opposition on March 25, 2022.  (Doc. 32.) Rodriguez-Arevalo filed a reply brief.  (Doc. 36.)  Thus, this motion is ripe for review.

In 1929, Congress enacted the Undesirable Aliens Act, which provided that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials . . . shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2.  The Immigration and Nationality Act of 1952 ("INA"), the first comprehensive immigration law, recodified existing provisions under Title 8 of the U.S. Code and continued to criminalize unlawful entry under Section 1326.  Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 229.

Rodriguez-Arevalo has presented legislative history for the 1929 law, the declaration of Professor Kelly Lytle Hernandez, and a declaration of Professor Benjamin Gonzalez O'Brien supporting his contention that members of the 1929 Congress sought to criminalize unlawful entry, at least in part, because of their endorsement of eugenics and opposition to Mexican immigration specifically.  (*See* Docs. 27-1 – 27-11 & 27-13 – 27-15.)  Rodriguez-Arevalo also attached a transcript from the evidentiary hearing held in another case challenging the same statute on the same grounds.  (Doc. 27-12.)

Professor Lytle Hernandez's declaration states that racial animus motivated the author of the bill criminalizing entry and re-entry without authorization.  (Doc. 27-1, p. 2.)  She further states that the politics of white supremacy dominated the politics of immigration control at the time and that the criminalization of

3

unauthorized entry was a racially motivated act.  (*Id.*)  She defines the 1920s as the "Tribal Twenties'—a time when the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics," and she attributes the 1929 Act to a rise in anti-Mexican sentiment and a corresponding increase of "Nativists" in Congress.  (*Id.*, at 3.)

Congress passed the INA in 1952.  Unlike previous piecemeal immigration legislation, the INA was a comprehensive immigration statute designed to "revise the laws relating to immigration, naturalization, and nationality."  Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 229.  Professor Gonzalez O'Brian's declaration states that explicit racist attitudes became socially less acceptable in the 1940s and 1950s, and that braceros[2] were largely portrayed as non-threatening disposable laborers, while undocumented immigrants were labeled "wetbacks," who were seen as a threat to the racial purity of the country, as they were not guaranteed to return to Mexico when their labor was no longer needed, as the braceros were.  (Doc. 27-2, pp. 15–16.)  In his view, Mexicans who were not laborers were also seen as criminals, drug dealers, smugglers, prostitutes, and homosexuals.  (*Id.*, at 16.)  He also provides quotes from some individual

---

[2]Professor Lytle Hernandez testified that "Operation Bracero" or the "Bracero Program" was a program implemented during World War II in which Latinx labor was funneled into the United States on a legal and temporary basis that was intended to ensure decent wages and human treatment for laborers.  (Doc. 27, p. 41; Doc. 27-12, pp. 74–77.)

legislators using the "wetback" slur and demonstrating eugenicist and racist views toward Mexicans at that time. (*Id.*, at 17).

## STANDARD OF REVIEW

At the outset, the court notes that the parties dispute the standard of review that should apply in this case. Rodriguez-Arevalo asserts that the court should apply the standard set forth in *Arlington Heights* because it is a facially neutral law that has a racially disparate impact and the legislative body was motivated to enact the statute, at least in part, by racism. (Doc. 27, pp. 5, 7–8.) Conversely, the Government contends that federal immigration laws are the exception to this rule. (Doc. 32, p. 7.) The Government's argument is based on the broad deference afforded to Congress in the area of immigration. (*Id.*, at 7–8.) The Government thus urges the court to apply the "facially legitimate and bona fide" standard, which is equivalent to rational basis. *See Breyer v. Meissner*, 214 F.3d 416, 422 (3d Cir. 2000) (holding that the test to be applied regarding immigration or naturalization is that Congress need only have a facially legitimate and bona fide reason).

Historically, the judicial branch has afforded broad deference to the other two branches of government in immigration matters. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (holding that matters involving immigration policies "are so exclusively entrusted to the political branches of

government as to be largely immune from judicial inquiry or interference.")
However, all criminal defendants are entitled to the constitutional guarantee of due
process secured by the Fifth Amendment, regardless of immigration status.  *See
Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be
held to answer for a capital or other infamous crime, unless on a presentment or
indictment of a grand jury, nor be deprived of life, liberty, or property without due
process of law"); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987)
(holding that 8 U.S.C. § 1326 must "comport with the constitutional requirement of
due process").

The Fifth Amendment provides that "[n]o person shall . . . be deprived of
life, liberty, or property without due process of law.  U.S. CONST. AMEND. V.
Although the words "equal protection" do not appear in the Fifth Amendment's
text, the Fifth Amendment's Due Process clause includes an equal protection
component and "[e]qual protection analysis in the Fifth Amendment area is the
same as that under the Fourteenth Amendment."  *Buckley v. Valeo*, 424 U.S. 1, 93
(1976).

While not argued by either party, the court observes that in the case of
*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.,* the Ninth
Circuit and a plurality of the Supreme Court recently declined to apply the rational
basis standard when evaluating an equal protection challenge to immigration

6

decisions made by the executive branch. *See Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 520 (9th Cir. 2018) *rev'd in part, vacated in part sub nom. Dept' of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020).

*Regents* involved the repeal of the Deferred Action for Childhood Arrivals ("DACA") by the Acting Secretary of the Department of Homeland Security. The Ninth Circuit applied the *Arlington Heights* standard of review to the executive decision repealing immigration enforcement policies, rather than applying rational basis because the decisions involved immigration. *Regents of the Univ. of California*, 908 F.3d at 520. The Supreme Court likewise applied *Arlington Heights* to the equal protection challenge. *Regents*, 140 S. Ct. at 1916. See also *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (applying *Arlington Heights* to an equal protection challenge to the executive branch's administration of the Temporary Protected Status program, which provides widescale nationality-based humanitarian harbor for foreign citizens).

Contrary to the Government's assertion, it is evident that not all immigration-related decisions, whether made by the executive branch or the legislative branch, are subject to rational basis review. The court finds that the appropriate standard of review here, when faced with an equal protection challenge to a criminal statute by a defendant, is the standard set forth in *Arlington Heights*.

DISCUSSION

A. Rodriguez-Arevalo Fails to Demonstrate that 8 U.S.C. § 1326
   Violates Equal Protection Under *Arlington Heights*.

A facially neutral statute can violate equal protection principles if it both has

a racially disparate impact and the legislative body was motivated to enact the

statute at least in part by racism.  *See Village of Arlington Heights v. Metropolitan*

*Housing Development Corp.*, 429 U.S. 252, 265–66 (1977).  Delving into

legislative intent is a delicate and nuanced inquiry.  The Supreme Court has

provided a non-exhaustive list of factors to consider when determining whether

government action has invidious intent as a motivating factor.  First, "[t]he

historical background of the decision is one evidentiary source."  *Id.*, at 267.  Next,

"[t]he specific sequence of events leading up to the challenged decision also may

shed some light on the decisionmaker's purposes."  *Id.*  Additionally, significant

"[d]epartures from the normal procedural sequence" or "[s]ubstantive departures"

from "the factors usually considered important by the decisionmaker" "might

afford evidence that improper purposes are playing a role."  *Id.*  Furthermore,

whether the effect of the challenged action "bears more heavily on one race than

another may provide" evidence of animus.  *Id.* at 266 (quoting *Washington v.*

*Davis*, 426 U.S. 229, 242 (1976) (internal quotations omitted)).  Lastly, the

legislative history of a statute, "especially where there are contemporary statements

by members of the decisionmaking body" is sometimes probative.  *Id.* at 268.

The Supreme Court has warned that courts must use caution when seeking to glean a legislature's motive from statements made by a handful of individual lawmakers. *See United States v. O'Brien*, 391 U.S. 367, 383–84 (1968) (while noting that reliance on legislative history is necessary and appropriate when courts are interpreting ambiguous statutes, "[i]t is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it"); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349–50 (2021) ("And while the District Court recognized that the [one legislator's] 'racially-tinged' video helped spur the debate about ballot collection, it found no evidence that the legislature as a whole was imbued with racial motives.")

Legislatures are presumed to have acted in good faith. *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). Additionally, the Supreme Court has recognized that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien*, 391 U.S. at 384. Furthermore, statements made by opponents of a bill are generally not appropriate evidence of Congress' motive for enacting legislation. *See NLRB v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 66 (1964) (cautioning against relying upon the views of a bill's legislative opponents when interpreting a statute and instead looking to the sponsors).

The burden of proof lies with the challenger to demonstrate that the law was enacted with discriminatory intent and has a disparate impact. If the challenger satisfies this burden, the burden shifts to the Government to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. Both of these burdens are by a preponderance of the evidence. *Hunter v. Underwood*, 471 U.S. 222, 225 (1985). If the challenger fails to meet his initial burden, the challenge is then addressed under rational basis. *Arlington Heights*, 429 U.S. at 265–65.

## 1. Disparate Impact

A showing of disparate impact on its own is not normally sufficient to establish an equal protection violation, but it is a relevant consideration. *Davis*, 426 U.S. at 242. Rodriguez-Arevalo contends that this prong of the test is met because 8 U.S.C. § 1326 disparately impacts one race (Latinx) more than others. (Doc. 27, p. 16.) He buttresses this argument with statistics. Rodriguez-Arevalo asserts that ninety-eight percent of those charged with illegal reentry in 2010 were from Latin America, and over 99% of those convicted of illegal reentry in 2020 were Hispanic. (*Id.*)

While the Government does not explicitly concede that § 1326 disparately impacts Latinx individuals, it does provide a non-discriminatory reason for the statistics relied upon by Rodriguez-Arevalo: geography. (Doc. 32, p. 12.) The

Government relies on statistics as well, asserting that Border Patrol had 405,036 total encounters in fiscal year 2020, and 400,651, or ninety-nine percent of them, occurred on the southwest border of the United States.  (*Id.*)  The Government then relies on *Regents* in arguing that this is not sufficient to state an equal protection claim.

While the court finds that § 1326 does disparately impact Latinx individuals as a statistical matter, this factor is not dispositive.  The analysis will proceed to examine whether § 1326 was enacted with a racially discriminatory purpose.

## 2.  Racially Discriminatory Purpose

The threshold question in examining Congress' intent is which Congress' intent is subject to review.  Rodriguez-Arevalo argues that the court should focus on the 1929 enactment of the Undesirable Aliens Act, the predecessor to 8 U.S.C. § 1326.  (Doc. 27, pp. 17–34.)  Rodriguez-Arevalo contends that subsequent recodification of the illegal reentry statute "did not cleanse the statute of its original taint."  (*Id.*, at 51.)  On the other hand, the Government asserts the "governing statutory framework" here is the INA, which was enacted in 1952.  (Doc. 32, pp. 20–30.)  Alternatively, Rodriguez-Arevalo argues that even if the discriminatory intent of the Congress that enacted the Undesirable Aliens Act in 1929 cannot be imputed to the Congress that enacted the INA in 1952, the court

should find that there was independent discriminatory intent and racial animus underlying the enactment of the INA in 1952.  (Doc. 27, pp. 39–49.)

The court finds that the relevant inquiry centers around the intent of the 1952 Congress in enacting § 1326 as part of the INA.  *Arlington Heights* instructs courts to look at the motivation behind the official action being challenged.  *See Arlington Heights*, 429 U.S. at 265–67 (describing analysis of intent as the intent underlying "the challenged decision").  Here, the official action being challenged is the statute under which Rodriguez-Arevalo has been charged—8 U.S.C. § 1326.  Thus, this court must discern the intent of the Congress that enacted the provision of § 1326 with which Rodriguez-Arevalo has been charged, rather than the intent of prior Congresses.[3]  The court also finds Rodriguez-Arevalo's argument about imputing the improper intent of one Congress to a subsequent Congress unavailing.

---

[3] *See United States v. Gamez-Reyes*, No. 21-CR-123, 2022 U.S. Dist. LEXIS 61831, at *8–9 (D. Colo. Mar. 31, 2022) (applying *Arlington Heights* and examining the intent of Congress in 1952 in enacting § 1326 as part of the INA); *see also United States v. Felix-Salinas*, No. 5:21-CR-70, 2022 U.S. Dist. LEXIS 48121, at *7 (M.D. Fla. Feb. 2, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 48129 (M.D. Fla. Mar. 17, 2022); *United States v. Cortez-Mendoza*, No. 2:20-CR-131, 2022 U.S. Dist. LEXIS 41117, *2 (E.D. Wash. Mar. 8, 2022); *United States v. Muñoz-De La O*, No. 2:20-CR-134, 2022 U.S. Dist. LEXIS 29868, at *28 (E.D. Wash. Feb. 18, 2022); *United States v. Ponce-Galvan*, No. 21-CR-2227, 2022 WL 484990, at *6 (S.D. Cal. Feb. 16, 2022); *United States v. Hernandez-Lopez*, No. 21-440, 2022 U.S. Dist. LEXIS 18649, at *14 (S.D. Tex. Feb. 2, 2022); *United States v. Sifuentes-Felix*, No. 21-CR-337, 2022 U.S. Dist. LEXIS 18111, at *5 (D. Colo. Feb. 1, 2022); *United States v. Sanchez-Felix*, No. 21-CR-310, 2021 U.S. Dist. LEXIS 24634, at *14–15 (D. Colo. Dec. 28, 2021); *United States v. Suquilanda*, No. 21-CR-263, 2021 U.S. Dist. LEXIS 202398, at *15 (S.D.N.Y. Oct. 20, 2021); *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1073–74 (D. Or. 2021); *United States v. Wence*, No. 3:20-CR-27, 2021 U.S. Dist. LEXIS 112805, at *11–12 (D.V.I. Jun. 16, 2021);

Rodriguez-Arevalo's arguments rely on two recent Supreme Court cases in which the Court discussed the intent of prior legislatures. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). The court agrees with Rodriguez-Arevalo that these cases support the contention that subsequent enactments of a statute do not erase its historical context. Furthermore, the court notes that historical context is certainly relevant to a legislative intent inquiry. Indeed, historical context is expressly considered within the *Arlington Heights* framework. However, the court does not agree with Rodriguez-Arevalo's assertion that *Ramos* and *Espinoza* are informative or dispositive of the issue in this case.

*Ramos* involved a question of whether "the Sixth Amendment right to a jury trial . . . require[d] a unanimous verdict to convict a defendant of a serious offense." *Ramos*, 140 S. Ct. at 1394. Although the Supreme Court took note of the "racist origins" of the Louisiana and Oregon statutes at issue, the Court's reasoning primarily rested on an examination of the right to a unanimous jury verdict grounded in common law. *See id.* at 1399–1402, 1405. The Supreme Court emphasized that the Sixth Amendment required "judges to assess the functional benefits of jury rules" and that this necessarily entailed "acknowledging

---

*United States v. Zepeda*, No. 20-CR-57, 2021 U.S. Dist. LEXIS 209853, at *8 (C. D. Cal. Jan. 5, 2021).

the racist history of Louisiana's and Oregon's laws." *Id.* at 1401 n.44.

Nevertheless, the Court held, "a jurisdiction adopting a nonunanimous jury rule

*even for benign reasons* would still violate the Sixth Amendment." *Id.* (emphasis

added).  Thus, the historical background relating to the racist origins of the statutes

at issue were not determinative of the outcome in *Ramos*.

   *Espinoza* involved a question of "whether the Free Exercise Clause . . .

barred" application of the Montana State Constitution's "no-aid" provision

prohibiting the use of tuition assistance provided by the state when used toward

religious schools.  *Espinoza*, 140 S. Ct. at 2251.  Again, the law's "checkered

tradition" was noted, but not relied upon by the Court.  Rather, the Court

invalidated the no-aid provision because it "bars all aid to a religious school simply

because of what it is, putting the school to a choice between being religious or

receiving government benefits."  *Id.* at 2257.

   Furthermore, neither a Sixth Amendment analysis nor a Free Exercise

Clause analysis requires a court to make a finding as to the motivation of a

legislature as the court is required to do here.  Accordingly, because *Ramos* and

*Espinoza* did not require the court to make a finding of legislative intent, neither

controls the outcome of this case.  Thus, the court is not persuaded that either case

supports Rodriguez-Arevalo's contention that § 1326 should be judged according

to the asserted intentions of the Congress that enacted a predecessor version of the

law at issue that was enacted twenty-three years before the law at issue.  (Doc. 27, p. 51.)  Accordingly, the court will limit its review to the historical context for the 1952 enactment of the INA and the intent of the 1952 Congress that enacted the INA.

### i.  Historical Background

In his motion to dismiss, Rodriguez-Arevalo describes at length the historical background of the 1929 Undesirable Aliens Act, the precursor for today's provision criminalizing unlawful entry.  This history suggests that at least some members of Congress were motivated to support immigration restrictions at least in part out of a desire to maintain the supposed purity of the white race and prevent racial mixing, and intended the laws to target races they deemed undesirable.  Although some of Rodriguez-Arevalo's evidence on this point is strong, most of the historical background is from a few decades before the passage of the INA.  As previously discussed, the intent of the 1929 Congress will not be imputed to the 1952 Congress.  Additionally, historical background revealing past discrimination cannot alone "flip[] the evidentiary burden on its head." *Abbott*, 138 S. Ct. at 2325.  The court must also consider the other *Arlington Heights* factors, on which Rodriguez-Arevalo does not provide much evidence at all.

ii. **Relevant Legislative History, Sequence of Events Leading to Enactment, and Departures from Normal Practice of Decisionmaking**

Rodriguez-Arevalo has provided very little legislative history suggestive of the motives of members of Congress in 1952 during the passage of the INA to support his argument.  What Rodriguez-Arevalo does provide is generic historical evidence of the time period between 1929 and 1954, specifically the repatriation drives of the Great Depression and the subsequent Bracero Program.  (Doc. 27, pp. 40–43.)  Additionally, Rodriguez-Arevalo points to the passage of Senate Bill 1851 in 1954, referred to as the "Wetback Bill."  (*Id.*, at 43.)  Rodriguez-Arevalo asserts that the racial animus surrounding the passage of Senate Bill 1851 is relevant because it was the same Congress that enacted the INA two months later.  (Id.)  However, he provides very little argument or evidence as to racial animus underlying the passage of the INA or the intent underlying the criminal provision § 1326 specifically.

Rodriguez-Arevalo's sole assertion as to the legislative history of the 1952 INA is President Truman's veto statement, which condemned the INA as "legislation [that] would perpetuate injustices of long standing" and "intensify the repressive and inhumane aspects of our immigration procedures."  (Doc. 27, p. 45; Doc 27-13, p. 2.)  President Truman also stated that it was "time to shake off this dead weight of past mistakes . . . time to develop a decent policy of immigration . .

. and a true reflection of the ideals we stand for, at home and abroad." (Doc. 27, p. 45; Doc. 27-13, p. 5.) Two days later, Congress overrode the veto and passed the INA. (Doc. 27, p. 46.) Rodriguez-Arevalo concludes that because the presidential veto was overridden by Congress, "there is no doubt of the racial animus underpinning the INA." (*Id.*) The court disagrees.

First, the Supreme Court has cautioned against relying on the views of a bill's opponents when discerning legislative intent. *See NLRB*, 377 U.S. at 66. Additionally, the INA was a lengthy and comprehensive immigration statute. There is nothing in the quotes selected by Rodriguez-Arevalo indicating that President Truman's concern was with the criminal provision in § 1326 specifically. Furthermore, in reviewing President Truman's statement in its entirety, it appears that his concern with the INA was primarily focused on the continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latin America or the criminalization of illegal reentry by those who have been deported. Thus, these few quotes from the statement of an opponent of the INA (President Truman) for unrelated reasons certainly do not prove that racial animus motivated Congress to enact § 1326.

Rodriguez-Arevalo next points to a report from Deputy Attorney General Peyton Ford praising § 1326 for making it easier to address the "wetback problem." While the use of racial slurs or epithets may be relevant to an inquiry

17

into legislative intent, Ford was not a member of Congress, so his use of this term is not evidence of Congress' intent or purpose in enacting § 1326.

Rodriguez-Arevalo's evidence on the remaining factors is even weaker. He does not establish any procedural or substantive irregularities in the passage of § 1326. Procedurally, the INA followed a comprehensive review of the entirety of the nation's immigration laws at the time. There is nothing substantively irregular about the INA or § 1326. The inclusion of a provision criminalizing illegal reentry was not irregular or new, as illegal reentry was already a crime pursuant to the 1929 law.

Having carefully reviewed the briefing and relevant legal authority, the court finds that Rodriguez-Arevalo has failed to prove independent invidious motive on the part of the 1952 Congress in codifying 8 U.S.C. § 1326.[4] While there is some indication that there may have been some racial animus on the part of some of the members of Congress, in also examining the legislative history of § 1326 and its subsequent amendments, Rodriguez-Arevalo falls short of the standard necessary to demonstrate invidious purpose. Thus, the court does not conclude that § 1326

---

[4] The court notes that numerous District Courts around the country have address identical constitutional challenges to §§ 1325 and 1326. (*See* Doc. 32, p. 3, n.1; *see also* n.3, *supra*.) Defendant points to only one court that found that § 1326 violated equal protection principles and granted a defendant's motion to dismiss the indictment. *See Carrillo-Lopez*, 2021 U.S. Dist. LEXIS 155741. Furthermore, the court notes that the only other court in the Third Circuit to address this argument has ruled against the defendant. *See Wence*, 2021 U.S. Dist. LEXIS 112805.

was enacted with discriminatory intent.  As such, Rodriguez-Arevalo's challenge will be addressed under the rational basis standard of review.

### B. Rodriguez-Arevalo Fails to Demonstrate That 8 U.S.C. § 1326 Violates Equal Protection Under Rational Basis Review.

Under rational basis review, the challenged law must be upheld if it is "rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303.  This court must find that 8 U.S.C. § 1326 is rationally related to a legitimate interest "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).

Applying this standard of review, which is highly deferential, the court concludes that 8 U.S.C. § 1326 is rationally related to legitimate governmental interests.[5]  The United States has an undeniably legitimate interest in regulating its border and preventing the entry of those individuals who have committed violent

---

[5] *See Felix-Salinas*, 2022 U.S. Dist. LEXIS 48129, at *12–14 (holding that the United States has a legitimate interest in regulating its border and deterring the reentry of those who have been removed, and noting that such purpose was specifically discussion in the Congressional debate surrounding the 1990 reenactment); *see also Muñoz-De La O*, 2022 U.S. Dist. LEXIS 29868, at *38–40; *United States v. Hernandez-Lopez*, 2022 U.S. Dist. LEXIS 18649, at *17–18; *United States v. Rivera-Sereno*, No. 2:21-CR-129, 2021 U.S. Dist. LEXIS 229579, at *10–11 (S.D. Ohio Dec. 1, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20-CR-83, 2021 U.S. Dist. LEXIS 214071, at *6 (N.D. Ohio Nov. 5, 2021); *United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114, 1120–21 (D.N.M. 2021); *United States v. Gutierrez-Barba,* No. CR-19-1224, 2021 U.S. Dist. LEXIS 99844, at *12–13 (D. Ariz. May 25, 2021); *Wence*, 2021 U.S. Dist. LEXIS 112805, at *29–30.

and drug-related crimes, as well as the reentry of those who have violated

immigration laws in the past.  Indeed, this exact interest was articulated in the

Congressional debate surrounding the 1990 reenactment of 8 U.S.C. § 1326 and

related statutes.  136 Cong. Rec. 36844 (Oct. 27, 1990) (this legislation will "not

disturb the basic reasons for which we have always, and will always, exclude

aliens: For cases where aliens have criminal records, when they are public health

risks, when they violate drug laws, when they are likely to become economic

burdens on the country, or *when they have previously violated U.S. Immigration

laws*.") (emphasis added).  As such, the court finds that § 1326 is rationally related

to a legitimate government interest and does not violate equal protection.

### CONCLUSION

For the foregoing reasons, Rodriguez-Arevalo's motion to dismiss the

indictment will be denied.  An appropriate order follows.

> s/Jennifer P. Wilson
> JENNIFER P. WILSON
> United States District Court Judge
> Middle District of Pennsylvania

Dated: May 16, 2022